# EXHIBIT  A

The Sociological Quarterly ISSN 0038-0253

# NEIGHBORHOOD DISADVANTAGE, SOCIAL CAPITAL, STREET CONTEXT, AND YOUTH VIOLENCE

Stacy De Coster*

North Carolina State University


Karen Heimer

University of Iowa


Stacy M. Wittrock

University of Iowa

This article integrates arguments from three perspectives on the relationship between communities and crime—constrained residential choices, social capital, and street context perspectives—to specify a conceptual model of community disadvantage and the violence of individual adolescents. Specifically, we propose that status characteristics (e.g., race, poverty, female headship) restrict the residential choices of families. Residence in extremely disadvantaged communities, in turn, increases the chances of violent behavior by youths by influencing the development and maintenance of community and family social capital, and by influencing the chances that youths are exposed to a criminogenic street context. We assess our conceptual model using community contextual and individual-level data from the National Longitudinal Study of Adolescent Health. Our findings suggest that individual or family status characteristics influence violence largely because of the communities in which disadvantaged persons and families reside. Although we find that community social capital does not predict individual violence, both family social capital and measures of an alternative street milieu are strong predictors of individual violence. Moreover, our street context variables appear to be more important than the social capital variables in explaining how community disadvantage affects violence.

A central focus in contemporary criminology has been identifying structural characteristics of communities that are associated with crime and violence (e.g., Bursik 1984; Taylor and Covington 1988; Bellair 1997; Sampson, Raudenbush, and Earls 1997; Baller et al. 2001; Rosenfeld, Messner, and Baumer 2001; Morenoff, Sampson, and Raudenbush 2001). Most of this research has focused on neighborhood rates of crime.[1] However, recent studies have begun to explore how community-level features impact individual-level differences in crime and violence (e.g., Simcha-Fagan and Schwartz 1986; Peeples and Loeber 1994; Aneshensel and Sucoff 1996; Elliott et al. 1996; Simons et al. 1996; McNulty and Bellair 2003a,b). An advantage of studies that use community-level as well as individual-level data (i.e., contextual studies) is that they are able to assess the extent to

*Direct all correspondence to Stacy De Coster, North Carolina State University, Department of Sociology and Anthropology, Box 8107, Raleigh, NC 27695-8107

which community characteristics mediate the effects of individual status characteristics, such as race and poverty status, on individual violence.

The issue of whether communities mediate the effects of status characteristics on violence is one that has been at the core of community and crime theorizing for several decades (see Shaw and McKay 1942) and is one that links criminological studies more broadly to research and theorizing on residential segregation (e.g., Wilson 1987; Massey and Denton 1988, 1993; Massey 1990). Although it seems to be accepted as a truism that communities play a core role in explaining the effects of race and poverty of individuals on their participation in violence, little research bears directly on this issue because studies that focus on individual violence and crime seldom include measures of community structure. A couple of recent studies have addressed this gap by examining the impact of racialized residence patterns on violence (McNulty and Bellair 2003a,b). However, research has not yet teased apart how family poverty, as well as race, restricts residence and steers some families into communities that foster violence and crime among youths. This is an important next step, given debates in urban sociology over the relative impact of race versus poverty on residential patterns (e.g., Wilson 1987; Massey and Denton 1988; Massey 1990; Morenoff and Sampson 1997), and macrolevel criminological research that attempts to tease apart the overlapping effects of race and poverty at the neighborhood and city levels of analysis (e.g., Krivo and Peterson 2000; Vélez, Krivo, and Peterson 2003). It also seems important to try to tease apart the contributions of family structure, especially female headship, to restrictions in residential patterns because family structure varies by race and poverty and is influential in the prediction of crime and violence (see Shihadeh and Steffensmeier 1994; Parker and Johns 2002).

A second advantage of contextual studies is that they are able to assess the joint effects of proximal (e.g., family and peer contexts) and more distal (e.g., communities) social contexts on the violent behaviors of individuals. The few existing studies of communities and crime that include proximal measures of both social bonds to families and deviant peer associations show that deviant peers are more important than family bonds for understanding the relationship between community characteristics and individual crime (e.g., Elliott et al. 1996; Cattarello 2000; McNulty and Bellair 2003a). This suggests that models of communities and crime that do not include nonconventional relationships and other aspects of an alternative criminal or street context—a context characterized by violent behaviors, opportunities for violence, and embeddedness in violent relationships—may be incomplete. Moreover, theoretical discussions in the community and crime literature suggest the relevance of street context for understanding links between race, community disadvantage, and violence (see Sampson and Wilson 1995; Shihadeh and Flynn 1996; Peterson and Krivo 1999). Yet, recent reviews of the literature continue to lament the lack of empirical attention to criminogenic street contexts and other nonconventional aspects of communities and social relationships (see Sampson et al. 2002; Kubrin and Weitzer 2003a). As such, we specify a model linking community characteristics to individual violence that considers conventional aspects of communities—social capital and social bonds—as well as nonconventional aspects of communities—a criminogenic street context.

Our approach to understanding the relationship between community characteristics and violence uses community-level contextual data and individual-level data to assess the importance of variables derived from three perspectives on the relationship between communities and crime—constrained residential choices, social capital, and street context perspectives. The constrained residential choices perspective suggests that minority and poor individuals will be more likely to engage in violence largely because of residential constraints that concentrate them in disadvantaged communities. The social capital and street context perspectives provide insights into the mechanisms through which these disadvantaged communities lead to individual violence. We add to recent research in this tradition in the following ways. First, we consider the distinct contributions of race, poverty, and female headship to residential patterns, which in turn affect the likelihood of adolescent violence. Second, we incorporate several indicators of a criminogenic street context. Studies assessing the mechanisms linking communities to crime have tended to focus on weak or attenuated conventional culture (e.g., Warner 2003; Browning, Feinberg, and Dietz 2004) or to focus rather narrowly on deviant peer associations (see Sampson, Morenoff, and Gonnon-Rowley's 2002 review). We include a set of variables to capture exposure to criminogenic street context and assess whether these variables as a set help to explain the effects of community disadvantage on violence.[2]

We begin by discussing research on the ways in which residential patterns are constrained by individual and family characteristics, such as race, income, and female headship. Next, we discuss theoretical arguments that link residential location—particularly socioeconomic disadvantage of communities—to violent crime and delinquency. In doing this, we highlight arguments from both social capital and street context perspectives. Finally, we derive hypotheses about residential constraints, social capital, and criminogenic street context and test them using panel data from the National Longitudinal Study of Adolescent Health, or Add Health (Udry 2003), which includes data on individuals and on the communities in which they reside.

## RACE, POVERTY, AND CONSTRAINED RESIDENTIAL CHOICES

Research in urban sociology shows that residence patterns in the United States are systematically restricted by characteristics of individuals and families (e.g., Wilson 1987; Massey and Gross 1991; Alba and Logan 1993; Massey and Denton 1993; South and Deane 1993). This research often focuses on the racial segregation of disadvantaged urban neighborhoods that arises because of economic constraints and discriminatory practices. For instance, Wilson (1987) proposes that middle-class blacks moved out of urban ghettos when legal barriers to racial segregation were reduced by civil rights legislation, leaving behind the "truly disadvantaged," or the most impoverished black families who did not have the resources to take advantage of opportunities to relocate. Essentially, as legal barriers to discrimination were toppled, black middle-class families who had the resources to relocate migrated out of the most disadvantaged areas in significant numbers; this resulted in the concentration of impoverished black residents in inner cities, who became socially as well as economically isolated (Wilson 1987, 1996).

theorizing on communities and crime is that the relationship between the structural characteristics of a neighborhood and crime rates in the neighborhood are not simply a reflection of the characteristics of the people residing in these areas (e.g., Shaw and McKay 1942; Bursik and Grasmick 1993). Instead, the structural characteristics of the neighborhoods in which impoverished and black individuals and families are able to make their residence are central for understanding why these individuals become involved in crime and violence (e.g., Shihadeh and Flynn 1996; Peterson and Krivo 1999; Vélez et al. 2003).[3]

The most direct way to assess this premise is to evaluate the extent to which the effects of individual status characteristics on individual violence are explained by measures of neighborhood disadvantage. Until recently, surprisingly few studies examined both individual and neighborhood contextual effects, perhaps because of the paucity of data containing information on both individuals and communities. Recent works by McNulty and Bellair (2003a,b), however, have begun to examine how individual and community characteristics work together, particularly with regard to the interplay between individual's racial statuses and neighborhood disadvantage. More specifically, McNulty and Bellair (2003a,b) show that the association between race (black versus white) and violent delinquency is accounted for by neighborhood disadvantage. This research is an important first step. However, better understanding the link between individual- and community-level processes requires consideration of the impact of poverty as well as race and family structure in shaping residential patterns and violence. This is especially important given ensuing debates concerning whether poverty and/or family structure explain the impact of race on residence (e.g., Wilson 1987; Massey 1990) and/or violence (e.g., Shihadeh and Steffensmeier 1994; Krivo and Peterson 2000; Parker and Johns 2002; Vélez et al. 2003).

Whereas macrolevel studies often cannot disentangle the separate effects of race, poverty, and female headship on crime (Land et al. 1990), it is possible to disentangle these effects at the individual level, given the large samples included in recent self-report surveys. In this study, we use data from the Add Health survey to examine the nonoverlapping effects of racial status, family poverty, and female headship on residence in extremely disadvantaged communities, which may increase the likelihood that youths are exposed to and engage in violence, all else constant. The question then becomes, how precisely is disadvantaged community context translated into the violence of individuals?

## THE TRANSLATION OF COMMUNITY DISADVANTAGE INTO INDIVIDUAL VIOLENCE

### Social Capital and Informal Social Controls

The question of how community disadvantage translates into individual violence has been the focus of much theory and research on communities and crime. In discussing the mechanisms through which community characteristics influence violence and crime, theoretical arguments often emphasize the importance of formal and informal

community controls (e.g., Shaw and McKay 1942; Sampson and Groves 1989; Gottfredson et al. 1991; Bursik and Grasmick 1993; Sampson et al. 1997). Specifically, these arguments propose that formal and informal mechanisms of social control break down in urban communities and in communities characterized by concentrated disadvantage and social isolation.

This general argument is central to social disorganization theory (Shaw and McKay 1942; Sampson and Groves 1989), the systemic model (Kasarda and Janowitz 1974; Bursik and Grasmick 1993), and perspectives that focus on community social capital (Sampson and Wilson 1995) and collective efficacy (Sampson 1997; Sampson et al. 1997). For present purposes, we draw on the concept of social capital because it dovetails with our emphasis on the importance of both community and family contexts for understanding individual violence. In fact, Coleman (1990:300) defines social capital as the relationships between actors that "inhere in family relations and in community organizations and that are useful for the cognitive or social development of a child or young person." Thus, this concept encompasses both community and family relations.

Generally, community social capital consists of interrelations or ties between families or individuals within a community. Some key dimensions of community-based social capital include the closure of social networks, community supervision, and the connectedness of individuals in the community (see Coleman 1988; Sampson 1997; Short 1997; Kubrin and Weitzer 2003a). An example of closure would be a case in which a youth's parents are friends with the parents of the youth's friends (Coleman 1988). In this case, the parents can share the task of supervision and parenting. Community supervision similarly entails the sharing of supervisory tasks among residents in a community. This concept, however, focuses more broadly on the ability and willingness of community residents to supervise the behavior of residents through informal surveillance and direct intervention (see Bursik and Grasmick 1993). Finally, the social connectedness of individuals in communities can be found in organizational participation and in community friendships (Sampson 1997). These community-based forms of social capital are the fundamental components of social organization emphasized in Shaw and McKay's (1942) social disorganization theory.

In the family context, social capital consists of interrelations or ties between individuals within a family. For instance, Coleman (1990) discusses intergenerational closure, or relationships between parents and children within a family, as an important component of familial social capital. Such social relationships parallel the emotional attachments between parents and children emphasized in Hirschi's (1969) social control theory (see Hagan, MacMillan, and Wheaton 1996). Thus, the mechanisms linking community structure to individual violence in a social capital model combine arguments from social disorganization theory at the community level and social control theory at the individual level. These mechanisms parallel also the concepts of private and parochial control emphasized in Bursik and Grasmick's (1993) systemic model of social disorganization. Family social capital is a rather clear example of private control because this control is grounded on intimate, primary groups and is achieved through the threatened withdrawal or allocation of social support and sentiment (see Hunter 1985; Bursik and

Grasmick 1993). Community-based capital is more consistent with parochial control because this control—including supervision of local teens and participation in organizations—relies on the relatively weak ties of secondary groups.

Overall, our discussion of social capital encompasses arguments from social disorganization, social control, and systemic theories of crime. In doing so, this model posits that structural aspects of communities either facilitate or inhibit the creation of community-based and family-based social capital, which in turn affect individual participation in violence.

### Criminal or Street Context

In line with the social capital approach, Anderson's (1997, 1999) ethnographic research on inner-city ghetto communities highlights the role of family processes in mediating the relationship between communities and violence. Specifically, his research shows that in the most disadvantaged areas of the inner-city ghettos, "decent" parents compensate for problems in the community by giving their children a clear message of their care and concern. Anderson (1999) notes, however, that youth from decent homes eventually must learn to deal with the reality of the streets, which can undermine significantly the ability of parents and families to control youth. This does not imply that the family is not an efficacious force in the inner city. It does suggest, however, that the effects of family-based social capital may be diminished by exposure to the street.

Anderson (1999) emphasizes that this street context is produced by the structural problems of the inner city. Specifically, concentrated disadvantage and social isolation from conventional institutions produce a context in which violence becomes a central component of life. Some of the important elements of this street milieu include the experience of and exposure to violence. When discussing exposure to violence, Anderson notes that younger children often witness the disputes of older people, which are resolved regularly through aggression and violence. These disputes teach youth that "might makes right," thereby promoting their own use of violence in future situations.

In addition to witnessing violence, youth in disadvantaged areas often experience violence at the hands of others in the community. It is not surprising, therefore, that an additional element of the street culture is a sense of hopelessness based on the belief among community youth that they could die violently at a young age. Indeed, Anderson (1999) notes that youth in the most disadvantaged communities readily accept this fate, which allows them to live on the edge and engage in behaviors, such as violence, without considering the effects that such behaviors may have on their futures.

Sampson's (1997) statements about the importance of culture in linking communities to crime are consistent with the aspects of criminogenic street context discussed thus far. Specifically, he proposes that youth in disadvantaged communities are likely to see violence as a way of life because they are likely to have role models who do not control their own violence and are likely also to witness violent acts in their community. To this, Sampson (1997) adds that the availability of and easy access to firearms and other weapons in disadvantaged communities increases the chances that youth will experiment with violence (see also Anderson 1999).

Each of these arguments can be viewed as consistent with traditional learning theories of crime (Sutherland 1947; Akers 1998). Easy access to firearms provides the opportunity for youth to engage in violence, and witnessing role models engage in violence likely provides them with techniques and definitions of violence. An additional element of street context is the embeddedness of youth in relationships that promote violence, which can be conceptualized as associations with deviant or criminal peers (see also Hagan and McCarthy 1997).

Overall, this discussion proposes that a criminogenic street context may emerge in extremely disadvantaged communities as a byproduct of poverty and other problems in the community. The street milieu—which increases the chances of embeddedness in deviant peer relationships, easy access to firearms, witnessing street violence, personal experiences with violent victimization, expectations that future victimization could result in death—subsequently impedes the ability of "decent" families to control the violent behaviors of youths. This underscores the combined importance of community, family, and peer contexts for understanding violent delinquency.

## HYPOTHESES

In the remainder of this article, we draw from the literature discussed previously to propose and test hypotheses about variation in serious violent delinquency. We begin with the expectation—based on much individual-level research on delinquency—that youths' violence will be associated with individual and family characteristics, such as race, ethnicity, female headship, and family socioeconomic disadvantage, as well as age and sex. A major question of our study is whether the associations between these factors and violence are in part because of their impact on residence patterns, specifically on residence in disadvantaged communities. In other words, we are interested in assessing the assertion that the effects of individual and family status characteristics on violence are explained partially by residence in disadvantaged communities. While this is a common assertion, research has not yet thoroughly addressed whether or not community disadvantage can account for the separate effects of race, poverty status, and family structure on adolescent violence. Thus, we assess the following hypothesis:

*Hypothesis One:* The effects of individual and family status characteristics— especially family disadvantage, female headship, race, and ethnicity—on violent delinquency will be reduced when a measure of community disadvantage is added to the model.

Following the recent burgeoning of research on social capital and crime, we expect that when parents participate in community organizations, neighbors help to supervise youths, and parents know their children's friends and friends' parents (i.e., high network closure), youths will be less likely to engage in serious violence. Connections between individuals within families, or family social bonding from a control theory perspective, can be considered a form of social capital and should reduce the chances of violence by youths. These effects should emerge beyond the effects of individual characteristics, family disadvantage, and community disadvantage. Furthermore, following other research

(e.g., Sampson and Groves 1989; McNulty and Bellair 2003b; Sampson 2004), we expect these social capital variables to help account for the effect of residing in socially and economically disadvantaged locales. This is because concentrated social and economic disadvantage may undermine the formation of social capital because families in these communities may lack the resources and institutional support needed to invest in social ties at the family and/or community level (Coleman 1988; see also Sampson et al. 1997; Sampson and Raudenbush 1999; Morenoff et al. 2001). This lack of social capital and informal social control subsequently frees youth in structurally disadvantaged communities to engage in violence and crime. This discussion generates the following hypothesis:

> *Hypothesis Two:* Family-based and community-based social capital—network closure, community participation, collective supervision, and family cohesiveness—will reduce the chances that youths engage in violence and will reduce the effect of disadvantaged communities on violence.

We also expect that youths who encounter criminogenic street contexts will be more prone to violence than other youths. Based on the literature reviewed previously, we consider criminogenic street contexts to include the presence of deviant peers, easy accessibility of guns, and a violent street environment that, following Anderson (1999), can be expected to result in youths' witnessing episodes of serious street violence, being subject to past violent victimization, and generally, expecting that life might be cut short by violent victimization in the future. Youths who encounter elements of this criminogenic context can be expected to be more likely than other youths to aggress and to solve problems with violence. Moreover, the work of Anderson and others suggests that this criminogenic street context is more likely to arise in extremely disadvantaged communities (Wilson 1987; Fagan and Wilkinson 1998). Specifically, Anderson (1999) proposes that people in disadvantaged and socially isolated communities are acutely aware that society has forgotten them and denies them access to legitimate means of resolving conflicts and problems, and this can lead to the emergence of a street context that promotes the use of violence to respond to conflicts (see also Kubrin and Weitzer 2003b). Youth and families in disadvantaged areas are exposed to this street environment on a daily basis. Although "decent" families may try to protect their children from the lessons of the street through the development of strong relationships, they constantly are in competition with the pervasive street environment. Despite the recent popularity of this argument, there is limited quantitative research on the links between community disadvantage, criminogenic street context, and serious violence by individual youths. From this literature, we derive and test the following hypothesis:

> *Hypothesis Three:* Exposure to elements of criminogenic street contexts—deviant peers, easy access to guns, witnessing serious street violence, experiencing violent victimization in the past, and expecting that future violent victimizations could be lethal—will increase the chances that youths engage in violent delinquency and will reduce the effect of disadvantaged communities on violence.

## DATA, MEASUREMENT, AND MODEL SPECIFICATION

### Data

We assess these predictions using the data from the National Longitudinal Study of Adolescent Health, or the Add Health Study (Udry 2003). Add Health is a nationally representative, probability-based survey of U.S. adolescents in grades 7 through 12 between 1994 and 1996 (Harris et al. 2003). These data are particularly well suited for our study because they include individual-level information on individual and family status characteristics, community characteristics, social capital, aspects of criminogenic street context, and self-reported violent delinquency. The data also include community-level information on census tracts in which individuals are located, which allow us to link individual characteristics with a measure of community disadvantage. Finally, we exploit the longitudinal nature of the data by assessing the effects of variables capturing individual and family characteristics, community disadvantage, social capital, and street context at wave 1 on subsequent violence measured at wave 2.

Add Health is based on a multistage cluster design in which the clusters were sampled with an unequal probability (Chantala and Tabor 1999). At the first stage, 80 high schools and 52 middle schools ("feeder schools") were sampled with replacement in 1994 and 1995. At the second stage of sampling, individual adolescents and parents were sampled from the school rosters and from those identified at the first stage, and were administered the wave 1 in-home questionnaire in 1995. The response rate for the wave 1 in-home questionnaire was 78.9 percent. The wave 2 in-home questionnaire was administered in 1996 to adolescents only. The attrition rate from wave 1 to wave 2 was 28.3 percent and 13,750 youths completed the wave 2 interview (Harris et al. 2003). The Add Health study design incorporates systematic sampling methods and implicit stratification to ensure that this sample of respondents are representative of U.S. schools in terms of region of the country, urbanicity, school type, ethnicity, and school size (Harris et al. 2003). In all of our analyses, we use the sample weights provided with the data, which are designed to account for the sampling design as well as the attrition from wave 1 to 2.[4]

We use variables from the first two waves (1995–1996) of the in-home questionnaire data, from the youth and parent interviews. In addition, we use the contextual data (from the Census and other agencies) on the tracts in which respondents reside. The inclusion of both of these sources of data—individual as well as independent measures of community-level characteristics—is an important strength of the Add Health for our study. We use the data from the 11,207 individuals who remain after listwise deletion of missing data.

### Measurement of Variables

We present estimates for a series of five models. Each model adds a block of covariates, corresponding to our theoretical predictions. Appendix A contains descriptions of these variables and Appendix B reports descriptive statistics. Our first model includes variables that represent individual and family status characteristics, as well as other control variables. We include the following individual and family characteristics, all measured at

wave 1: *youth's race* (black or other), *Latino ethnicity*, residence in a *female-headed house-hold*, *parents' high school education*, the family's *receipt of public assistance*, *gender*, and *age*.[5] All of these variables, with the exception of age, are binary. Black racial status is coded 1 if the youth reports that she/he is African American or black and 0 otherwise. Latino ethnicity is coded 1 if the youth reports that she/he is Latino and 0 otherwise. Residence in a female-headed household is coded 1 if the respondent reported living with only a residential mother, aunt, grandmother, or any combination of the three, and if there was no male adult present in the household.[6] Parents' high school education or less is coded 1 if the parent respondent reports that the highest level of education achieved by her/himself or her/his spouse is a high school degree or less. Receipt of public assistance is coded 1 if parents reported at least one of the following conditions, and 0 otherwise: parent or spouse received public assistance, generally; any member of the household received Aid to Families with Dependent Children (AFDC) in the last month; any member of the household received food stamps in the last month; and any member of the household received a housing subsidy or lived in public housing in the last month. Gender is coded 1 for male, 0 for female.[7] Age ranges from 12 to 21.

Our second block of variables, all measured at the level of the census tract and drawn from government data, is designed to capture neighborhood context.[8] Here we include a binary variable coded 1 if the respondent lives in an *urban neighborhood*, and 0 otherwise. We also include a variable created through principal components analysis that includes indicators associated with high levels of *community disadvantage*, following previous research (e.g., Wilson 1987; Land, McCall, and Cohen 1990; Krivo and Peterson 1996; Sampson et al. 1997; Morenoff, Sampson, and Raudenbush 2001). The variables that are entered into our principal components score include the proportion of the population that is black, proportion of households that are female headed, proportion of ever-married men who are divorced or separated, total unemployment rate, male unemployment rate, median household income, and proportion of the population with income below the poverty line. This index has a Cronbach's alpha of 0.74. Our construction of this index follows other studies' measures of economic disadvantage (e.g., Sampson et al. 1997; Sampson and Morenoff 2004) and adds theoretically relevant variables capturing the presence of employed and married adult male role models.[9]

The next model that we estimate adds *youth's prior serious violence* to the covariates described previously. This is a composite variable that captures the range of youths' serious violent offending before the wave 1 interview (see Appendix A for further details). We include this variable because it affords some control for unmeasured, unchanging characteristics of individuals, and thus results in a conservative estimate of the associations between variables in our model than would be possible if we omitted a measure of prior violence.[10] This includes self-reports of the following types of violence (see Appendix A for full description): engaged in a serious fight during the previous 12 months; used or threatened to use a weapon to get something from someone during the previous 12 months; hurt someone badly enough to need bandages or care from a doctor or nurse during the previous 12 months; shot or stabbed someone during the previous 12 months; ever used a weapon in a fight. Add Health contains only categorical information on

youths' self-reported violence, and most youths reported that they had engaged in the forms of serious violence listed previously either one or two times in the past year (one of the categorical choices in the Add Health interview), or not at all in the past year. We therefore created a 0 to 1 variable for each type of violence, with 0 corresponding to no serious violence in the past year, and 1 corresponding to 1 or more violent delinquent acts in the past year. We then summed across the five types of serious violence to produce a serious violence index comprising six categories, ranging from 0 to 5. This violence index thus captures the range of youths' involvement in forms of serious violence. As we discuss later, we also discuss results from supplementary analyses in which the outcome variables are the separate measures contained in the violence index.

We next estimate a model that adds a set of variables capturing conventional social capital at the wave 1 interview. These variables are designed to measure *network closure, parents' participation in organizations, collective supervision,* and *family cohesiveness.* We measure network closure using the parent's report of how many parents of her/his child's friends she/he has talked to in the four weeks preceding the interview. This is the same variable that Coleman (1988) identifies as a good measure of this concept. Parental participation in organizations is a four-item composite variable measured by the parent's report of being a member of different community organizations or participating in fund-raising at his/her child's school. Collective supervision is a two-item composite variable that includes the parent respondent's report of whether neighbors share in the supervision of children in the neighborhood, following previous research (e.g., Sampson and Groves 1989). Specifically, we use the parent's response to items asking whether she/he would tell a neighbor if she/he saw the neighbor's child getting into trouble, and whether she/he thought the neighbor would do the same. We create a family cohesiveness variable using a principal components analysis that combines the youth's wave 1 self-reports about attention received from the family, understanding by the family, and having fun with the family. The Cronbach alpha for this principle component is 0.78.

Finally, we estimate a model that adds variables that capture different aspects of criminogenic street context, all measured at wave 1.[11] We specify these variables at wave 1 to ensure that the temporal ordering matches the causal ordering of our theoretical arguments. We first include *deviant peer associations,* measured by youths' reports of their friends' use of drugs, alcohol, and cigarettes. While this measure does not capture associations with violent peers (and such a measure is not available in the Add Health), exposure to peers who engage in deviance in any form—even substance use—is an important dimension of a criminogenic context. Moreover, research on the generality of deviance shows that youths who use controlled substances are more likely than other youths to engage in other types of crime, including violence (e.g., Osgood et al. 1988).

We measure the *accessibility of guns* as a binary variable, through youths' self-reports that they have "easy" access to guns in their homes. This is not simply a measure of gun availability, but rather captures youths' perceptions that they have "easy" access to guns in their homes. We also include a binary variable capturing youths' self-reports of *witnessing serious street violence* (i.e., a stabbing) in the year prior to the wave 2 interviews.[12]

*Expectation of lethal violence* is measured by youths' perceptions of the likelihood that they could die from a serious violent victimization by age 21. Finally, we include a composite variable capturing youths' experiences with *serious violent victimization,* including being stabbed or shot in the past year.

Our outcome variable, involvement in *serious violent delinquency* during the year between the wave 1 and wave 2 interviews, is measured identically to the measure of prior serious violence and comprises a six-point ordinal scale, as described above. Again, this variable captures the range of involvement in serious violent offenses and captures important differences in involvement in violence across individuals.

## Model Specification and Estimation

Three basic features of the data must be accounted for in our statistical models: First, the dependent variable is measured on a six-category ordinal scale; it is therefore more appropriate to use an ordinal-response rather than a continuous-response regression model. Second, the sampling design uses schools as the primary sampling units, which produces potential within-cluster correlation. Third, we must incorporate sampling weights to account for the unequal weights probability sampling. To account for all three features of these data, we weight the data and use generalized estimating equations to estimate correlated response ordinal logit models in our analyses of serious violence (Lipsitz, Kim, and Zhao 1994).

To be more specific, we define $Y_{h(i)}$ to be the six-category ordinal response for the *h*th respondent within school *i* (i.e., cluster *i*). The response distributions are modeled as functions of covariates $\{x_{h(i)}\}$ through the ordinal logit regression model:

$$\log \text{odds} (Y_{h(i)} > k) = \beta_k + \beta x_{h(i)}, k = 0, 1, 2, 3, 4; h = 1, \ldots, n_i; I = 1, \ldots, 147.$$

Here, $\beta$ is the vector of regression coefficients. We use generalized estimating equations that are identical to the multinomial likelihood equations that treat all $n_1 + \ldots + n_{147} = 11{,}207$ observations as independent and weight each contribution according to its sampling weight. These estimates of $\beta$ from the estimating equation are consistent, even when there is significant within-cluster correlation (Lipsitz et al. 1994). We compute estimates of standard errors that are valid when there is within-cluster correlation using an empirically adjusted covariance matrix. We used SAS GENMOD to estimate our models.

To assess the robustness of our findings using the index of violence, we also report the results of logistic regression analyses on two of the violent acts included in the index—engaging in a serious fight and shooting or stabbing someone in the past 12 months. We use the same procedures discussed previously in estimating these models.

## RESULTS

The results of our analyses provide general support for the arguments we develop above. To summarize, our results suggest that individuals and families may be constrained in their residential choices, and this has some consequences for violent delinquency. In

addition, aspects of both conventional social capital and criminogenic street contexts influence the likelihood of violence. We present our findings in Table 1.

We begin by discussing model 1, which reveals how violence varies across race, ethnicity, family disadvantage, and sex. Specifically, the results for model 1 show that blacks, Latinos, and men are more likely than their comparison groups to have been involved in a broader range of serious violence, measured at wave 2. Youths from disadvantaged families—those that are female headed, receive public assistance, and that are headed by adults whose highest education is a high school degree or less—are also likely to have higher scores on our wave 2 violence measure than other youths.

Model 2 shows that although urban residence has no effect, community disadvantage has a significant effect on serious violent delinquency that is beyond the effects of the variables in model 1. Moreover, adding community disadvantage to the equation appears to result in some decreases in the effects of the individual and family characteristics on violence reported in model 1. The most notable decrease is the effect of race, but there also appear to be some decreases in the effects of Latino ethnicity, family's receipt of public assistance, and parents' education. The implication of this, consistent with our discussion of the literature, is that minorities and disadvantaged families experience constrained residential choices and are more likely to reside in disadvantaged communities, which in turn translates into a higher likelihood of youth violence.

Beyond this, we note that the effects of several youth and family disadvantage variables continue to be associated with violent delinquency, even after community disadvantage is controlled. Model 2 shows that Latino youths and those from female-headed families receiving public assistance are more likely to be violent than their counterparts, regardless of whether they live in an extremely disadvantaged community.

Model 3 adds youths' prior involvement in serious violence. Not surprisingly, the association between prior violence and subsequent violence is highly significant, consistent with the stability of delinquency demonstrated in previous research. Moreover, once prior violence is controlled, the associations between violence and Latino ethnicity, public assistance, and female headship become nonsignificant. This makes sense, given the high level of stability in violence across the two waves and the association between ethnicity and family disadvantage reported in model 1. Nevertheless, we note that the association between community disadvantage and violence remains statistically significant (model 3). This is an important finding. Even after taking account of individuals' own propensity for violence as measured by past behavior (and thus accounting for unmeasured, unchanging characteristics of individuals), youths who live in more disadvantaged communities are more likely than youths in other neighborhoods to score higher on our measure of serious violent delinquency at wave 2. The coefficient associated with residence in a disadvantaged community in model 3 indicates that a standard deviation increase in the principal component score for disadvantaged communities is associated with a multiplicative change of about 1.09 (or 9 percent increase) in the odds that youths will engage in more serious violence, even when all of the other variables in this model are controlled.

Model 4 adds our variables designed to capture conventional social capital. Counter to our expectation, we find no significant effects of network closure, parental

Stacy De Coster, Karen Heimer, and Stacy M. Wittrock          Neighborhood Disadvantage and Violence

TABLE 1. Parameter Estimates for the Ordinal Logistic Regression Model of Violent Delinquency

| Variables | Model 1 | Model 2 | Model 3 | Model 4 | Model 5 |
|---|---|---|---|---|---|
| Individual/family characteristics | | | | | |
| Youth's sex (male) | 0.974*** (0.058) | 0.976*** (0.058) | 0.592*** (0.073) | 0.651*** (0.075) | 0.690*** (0.077) |
| Youth's black racial status | 0.163* (0.082) | 0.027 (0.095) | -0.171 (0.108) | -0.126 (0.107) | -0.028 (0.106) |
| Youth's Latino ethnicity | 0.300*** (0.087) | 0.239** (0.085) | 0.156 (0.086) | 0.165 (0.089) | 0.169 (0.088) |
| Youth's age | -0.034 (0.020) | -0.032 (0.020) | -0.039* (0.020) | -0.060** (0.020) | -0.126*** (0.024) |
| Female-headed household | 0.243** (0.080) | 0.218** (0.081) | 0.083 (0.081) | 0.055 (0.079) | 0.000 (0.078) |
| Parent education high school or less | 0.185* (0.081) | 0.151 (0.082) | 0.072 (0.084) | 0.067 (0.084) | 0.071 (0.083) |
| Parent receiving public assistance | 0.334*** (0.100) | 0.265** (0.098) | 0.140 (0.069) | 0.114 (0.114) | 0.117 (0.114) |
| Neighborhood context | | | | | |
| Urban neighborhood | | 0.092 (0.072) | 0.048 (0.487) | 0.041 (0.067) | 0.050 (0.069) |
| Community disadvantage | | 1.989** (0.674) | 1.498* (0.728) | 1.503* (0.716) | 1.055 (0.696) |
| Involvement in prior violence | | | | | |
| Youth's involvement in prior violence | | | 0.970*** (0.033) | 0.938*** (0.033) | 0.817*** (0.035) |
| Conventional social capital | | | | | |
| Network closure | | | | 0.004 (0.018) | 0.004 (0.019) |
| Parents' participation in organizations | | | | -0.066 (0.040) | -0.051 (0.040) |
| Collective supervision | | | | 0.002 (0.044) | 0.006 (0.046) |
| Family cohesiveness | | | | -5.363*** (0.927) | -3.779*** (0.934) |
| Criminogenic street context | | | | | |
| Deviant peer associations | | | | | 0.356*** (0.036) |
| Accessibility of guns | | | | | 0.038 (0.092) |
| Witness serious violence | | | | | 0.427*** (0.093) |
| Expectation of lethal victimization | | | | | 0.002 (0.047) |
| Past violent victimization | | | | | 0.184 (0.119) |

*p < 0.05, **p < 0.01, ***p < 0.001.
Note: Standard errors are in parentheses.
N = 11,207.

participation in community organizations, or collective supervision on the range of violent offending of youth. We note, however, that the weak associations between these variables and youths' violence are not entirely inconsistent with previous research. Indeed, Warner and Wilcox Rountree (1997) note that "while acceptance of the importance of local social ties seems strong within modern social disorganization theory, there really is quite limited support for this assumption" (p. 522). To the extent that there is support for social ties, it may be limited to property crimes. For instance, the structural-level study of Sampson and Groves (1989) found stronger effects of social capital variables on property crime than on violent crime. Similarly, Johnstone (1978) reported that family status better explained violent crime than did community status. Such findings have prompted some researchers to suggest that community-based social capital may be less important for predicting violent crimes than it is for predicting property crimes (see Bursik and Grasmick 1993; Peeples and Loeber 1994).

Yet, we find that family cohesiveness has a substantial deterrent effect on youth violence, which offers partial support for Hypothesis 2 (model 4). Our findings regarding the set of social capital variables are generally consistent with Hirschi's (1969) social control theory and with Bursik and Grasmick's (1993) conclusion that private controls, or controls within primary groups, may be more important for predicting crime and violence than are parochial controls, or controls within secondary community groups. We discuss this issue further in the conclusions.

Overall, our measures of social capital do not appear to add much to our understanding of the link between community disadvantage and adolescent violence; indeed the coefficient associated with community disadvantage in model 3 is very similar to the coefficient in model 4, which adds the social capital variables.

Our fully specified model—model 5—is reported in the last column of Table 1. This model adds the variables we use to capture criminogenic street context. As we discussed previously, these variables rarely are included in research on communities and crime, and when they are included, they are not viewed as a set capturing street context but are treated more as control variables. The results from model 5 show that consistent with Hypothesis 3, two important aspects of street context have strong significant effects on the range of involvement in violent delinquency. First, we find that youth who are more embedded in deviant peer groups at wave 1 are more likely to engage in a range of violent acts at wave 2. This is the case even though our measure of peer deviance captures illicit substance use by youths' friends and not violent behavior. Indeed, a standard deviation unit increase in associations with deviant friends is associated with an increase of about 1.36 times (or 36 percent) in the odds that youths will subsequently commit serious violence. Second, we find that having witnessed serious violence (in the form of a stabbing) strongly increases the chances that youth report involvement in a range of violent acts.[13] Youths who reported witnessing serious violence at wave 1 are about 1.53 times (or 53 percent) more likely to report violent delinquency at wave 2 than youths who did not previously witness serious violence, even after previous violence and the other variables in the model are controlled.

We do not, however, find a significant relationship between violence and easy access to guns in the home. It may be that youths often obtain guns and other weapons from

places other than home, which is not captured in our measure. We also do not find associations, net of the other variables in the model, between violent behavior and youths' expectations of lethal victimization or their previous experiences with serious violent victimization (i.e., being shot or stabbed).

The results from model 5 also show that the association between family bonds and youths' violence remains significant after the street-context variables are taken into account. Although the effect of family bonds clearly is diminished compared with its effects in model 4, it remains strong and a standard deviation unit increase in the principal components score for cohesive families translates into an decrease of about 15 percent in the odds that youths engage in future violent delinquency. In short, our findings suggest that families are somewhat efficacious in controlling violence, even when competing with the influences of the street. However, while a standard deviation unit increase in family cohesiveness reduces the odds of violence by about 15 percent, recall that witnessing violence and a standard deviation unit increase in deviant peer associations increase the chances of violence by 53 and 36 percent, respectively. We view these as important findings, considering that studies of communities and crime focus predominantly on the mediating effects of concepts related to social control—i.e., social capital and collective efficacy—without much consideration afforded to subcultural or street context variables (see Sampson et al.'s 2002 review).

We note that the effects of community disadvantage are finally reduced to nonsignificance once the street-context variables are controlled (model 5). This suggests that fully understanding the effects of structural disadvantage on violence requires considering youths' exposure to elements of criminogenic street context. The only individual characteristics that remain significantly associated with violence after our social process variables are considered are age and gender. This is consistent with the many studies that note that men and younger adolescents are consistently involved in more delinquency, even after social factors are taken into account.

### Supplementary Analyses

To assess the robustness of our findings using the violence index, we repeated our analyses using the separate variables comprising the index as outcomes. Each of these was specified as a binary variable, as discussed previously. We report two of these models in Table 2, engaging in a serious fight and shooting or stabbing someone, which are the least serious and most serious items in the index, respectively. Our analyses of all of items comprising the index produce results very similar to those reported in Table 2. These supplementary analyses show clearly the same pattern of results reported in the final model of Table 1. These findings thus indicate that the story that unfolds in the analysis of our violence index holds for all of the individual forms of violence comprising our index.

## CONCLUSIONS

The findings from our study suggest that violent delinquency is largely a product of individual status characteristics, family disadvantage, community disadvantage, weakened

Neighborhood Disadvantage and Violence      Stacy De Coster, Karen Heimer, and Stacy M. Wittrock

TABLE 2.  Parameter Estimates for the Logistic Regression of Select Individual Violence Items

| Variables | Serious fight | Shot/stabbed |
|---|---|---|
| **Individual/family characteristics** | | |
| Youth's sex (Male) | 0.585*** (0.078) | 1.403*** (0.246) |
| Youth's black racial status | −0.183 (0.115) | 0.493 (0.271) |
| Youth's Latino ethnicity | 0.202* (0.099) | 0.338 (0.288) |
| Youth's age | −0.109*** (0.025) | −0.140 (0.079) |
| Female-headed household | 0.020 (0.086) | −0.149 (0.234) |
| Parent education high school or less | 0.013 (0.082) | 0.308 (0.230) |
| Parent receiving public assistance | 0.103 (0.119) | 0.007 (0.247) |
| **Neighborhood context** | | |
| Urban neighborhood | −0.008 (0.072) | 0.320 (0.263) |
| Community disadvantage | 0.765 (0.646) | 1.984 (2.217) |
| **Involvement in prior violence** | | |
| Youth's involvement in prior violence | 0.716*** (0.051) | 0.463*** (0.080) |
| **Conventional social capital** | | |
| Network closure | 0.013 (0.020) | −0.042 (0.065) |
| Parents' participation in organizations | −0.057 (0.044) | 0.049 (0.118) |
| Collective supervision | 0.010 (0.048) | 0.099 (0.157) |
| Family cohesiveness | −3.749*** (1.086) | −6.625* (2.881) |
| **Criminogenic street context** | | |
| Deviant peer associations | 0.310*** (0.042) | 0.544*** (0.109) |
| Accessibility of guns | 0.001 (0.096) | −0.093 (0.252) |
| Witness serious violence | 0.452*** (0.114) | 0.853*** (0.233) |
| Expectation of lethal victimization | −0.025 (0.049) | −0.005 (0.104) |
| Past violent victimization | −0.052 (0.141) | 0.109 (0.258) |

*$p < 0.05$, **$p < 0.01$, ***$p < 0.001$.
Note:  Numbers in parentheses are standard errors.

family bonds, and exposure to some elements of a criminogenic street milieu. More specifically, we find evidence consistent with the argument that minorities and disadvantaged families experience constrained residential choices, resulting in a greater likelihood of residing in disadvantaged communities. Living in these communities subsequently translates into a higher likelihood of youth violence.

Our exploration of the link between community disadvantage and violence shows that our measures of community social capital are relatively unimportant for understanding the relationship between community disadvantage and youth violence. None of our variables tapping direct experiences with elements of community social capital are associated with youth violence. Family cohesiveness does curb youth violence, however.

It is possible that our findings about the effects of community social capital may have been different if we had access to community-level measures of social capital—such as the densities of ties within neighborhoods and pervasiveness of collective supervision (Sampson et al. 2002). Unfortunately, there were very few individuals in many of the

census tracts in Add Health, which precludes aggregating the data from individuals to develop reliable measures of community-level social capital. Yet, this is an important issue to consider in future data collection efforts. There may be instances in which families are not embedded within the social relationships within their community, even though there are strong community relationships surrounding them. And the likelihood of violence among adolescents whose families are embedded in community relationships in tight-knit communities may differ from the likelihood of violence among those whose families are not embedded in community relationships within the same tight-knit communities. Fully assessing this possibility, which bears out in ethnographic research (see Furstenberg et al. 1999), would require studying the interaction between individual-level reports of family's ties and a measure of aggregate strength of family ties at the community level.

Future research linking community disadvantage to violence by individual youth may also want to consider including additional measures of social ties. In particular, such research could incorporate measures of the extent to which families and communities are mobilized to enact social ties for the good of the community (e.g., Sampson et al. 1997), as well as measures of public social ties—ties between communities and external resources (e.g., Vélez 2001). Inclusion of these measures may show that social ties are more important for understanding links between community disadvantage and violence by youth than what our study reports.

Although we did not find that youths who directly experienced higher levels of community social capital were less violent than other youths, our analysis did support our hypothesis about exposure to criminogenic street context. Specifically, youths who have more deviant friends and have witnessed violence are more likely to engage in serious violence. Moreover, our set of variables capturing criminogenic street context together reduce the association between community disadvantage and youth violence to nonsignificance. Therefore, understanding the links between community disadvantage and violence seems to require careful consideration of exposure to criminogenic street context. Future research should go beyond existing work to develop a more thorough assessment of the important elements of criminogenic street context and to move beyond individual exposure to try to assess whether individual- and community-level norms and beliefs about appropriate uses of violence play a part in linking community disadvantage to violence.

The findings from the present study contribute to the literature in several ways. First, we go beyond existing macrolevel research to show that the relationship between violence and individual level, race, ethnicity, poverty, parents' education, and female headship can be explained in part by the types of communities in which families and individuals reside. Although there is widespread acceptance among criminologists that community structural disadvantage creates race, ethnicity, and poverty differences in violence, empirical research has not thoroughly examined whether community-level measures of disadvantage (measured apart from individuals' perceptions of disadvantage) do indeed account for variations across race, ethnicity, and family disadvantage in violence measured at the individual level.

More specifically, we show that race (black compared to nonblack) differences in violence result largely because of residence in disadvantaged communities. This individual-level finding is at least consistent with the arguments of macrolevel criminologists about the strong association between racial composition and poverty rates of communities (e.g., Krivo and Peterson 2000). By contrast, we find that residence in disadvantaged communities does not fully explain the effect of family disadvantage—measured by female headship, low levels of parent education, and family receipt of welfare—on participation in violent delinquency. Disentangling of the effects of race and family disadvantage or poverty as we have done here represents another contribution of this research.

A second contribution of our findings is that they highlight the importance of exposure to criminogenic street context in studies of communities and crime. As we noted previously, the effects of community disadvantage on violence are finally reduced to nonsignificance in our final model, which adds our street-context variables. Strong family cohesiveness reduces violence but does not appear to explain the negative consequences of extreme community disadvantage. This suggests that family bonds do not operate in isolation but combine with elements of a criminogenic street context to explain variation in violence across individuals. This is consistent with Anderson's (1999) argument that "decent" families can serve as a buffer to the problems of the inner city, although the ability of families to do so can be undermined by the street culture. It is also consistent with the original formulations of social disorganization theory (Shaw and McKay 1942), as well as learning theories. This finding suggests generally that future research should continue to explore the dual roles of oppositional street context and family cohesiveness in explaining serious violence and in mediating the relationship between structural aspects of communities and the violence of individuals within communities.

Finally, our article demonstrates that studies of individual violence can benefit from considering research in urban sociology and theories in criminology that focus on rates of crime and violence across communities. This emphasizes the importance of including both community-level and individual-level measures in future research on violent delinquency.

## ACKNOWLEDGMENTS

Our research was supported by a grant from the College of Humanities and Social Science at North Carolina State University and by funding from the National Consortium on Violence Research. The authors are grateful to Joseph B. Lang for his statistical advice. The data for this study are from the Add Health project, a program project designed by J. Richard Udry (PI) and Peter Bearman, and funded by grant P01-HD31921 from the National Institute of Child Health and Human Development to the Carolina Population Center, University of North Carolina at Chapel Hill, with cooperative funding from 17 other agencies. Persons interested in obtaining data files from the National Longitudinal Study of Adolescent Health should contact Add Health, Carolina Population Center, 123

West Franklin Street, Chapel Hill, NC 27516-2524 (http://www.cpc.unc.edu/addhealth). Neither the funding agencies nor the collectors of the data bear any responsibility for the analyses and interpretation drawn here.

## NOTES

[1]Although studies in the communities and crime tradition also focus on victimization or suitable targets and fear of crime (see Wilcox Rountree and Land 1996; Markowitz et al. 2001; Wilcox, Land, and Hunt 2003), we focus here on research that more pointedly targets the causes of crime.

[2]When studies have included variables that tap what we call criminogenic street context, they have tended to treat these as control variables entered before variables like community disadvantage (e.g., McNulty and Bellair 2003a).

[3]Research on communities and crime juxtaposes composition or selection arguments with arguments focusing on emergent properties of communities (see Sampson 1985). Our theoretical discussion and empirical assessment of residential constraints take into consideration composition/ selection; discussion and assessment of community effects, social capital, and street context are consistent with perspectives focusing on emergent properties.

[4]There were a few variables with nontrivial missing data that were not addressed in the sampling weights, namely, information on network closure, parent's participation in organizations, and collective supervision. We reestimated our models using mean substitution for missing data, and found no meaningful differences in the findings reported here.

[5]We include only ascribed characteristics and characteristics of families over which adolescents have no control (i.e., poverty status) as factors determining selection into disadvantaged communities. This is consistent with Sampson et al. (2002) argument that the strategy of entering individual, family process, and peer variables as controls alongside neighborhood characteristics confounds the "importance of both long-term community influences and mediating developmental pathways regarding children's personal traits and dispositions, learning patterns from peers, family socialization, and more" (p. 469).

[6]Seventeen cases were deleted from the analysis because the respondents reported multiple residential mothers and/or multiple residential fathers. Although some researchers advocate the use of additional measures of family structure (see Parker and Johns 2002), we focus on female headship because it is linked most often to family disadvantage and thus is part of the nexus of factors that constrains residential choices and leads to selection into disadvantage communities.

[7]Twenty-three cases were deleted from the analysis because the respondents' reported sex was different in wave 1 and wave 2 of the interviews.

[8]Studies demonstrate that residents in particular areas tend to disagree about the exact boundaries of their neighborhood (see Furstenberg et al. 1999), which renders the measurement of appropriate neighborhood units problematic. Given these constraints on systematic measurement of neighborhoods and given restrictions on available data generally, researchers often have used census tracts in their analyses of urban crime (Krivo and Peterson 1996; Crutchfield, Glusker, and Bridges 1999; Peterson, Krivo, and Harris 2000; McNulty and Bellair 2003a). Census tract boundaries are drawn by census tract committees to account for natural boundaries and population characteristics in a way that creates units that are meant to represent natural social aggregates. Research on appropriate units of analysis reports that use of census tract aggregates does not produce substantially different results from aggregates such as block groups (see Gephart's 1997 review).

[9]We also estimated models that included measures of residential stability and neighborhood crime but found that these variables were highly associated with our community disadvantage index, and we could not disentangle their separate effects. Our principle components analyses indicated that the reliability of the community disadvantage scale was decreased when these variables were added to the factor.

[10]Moreover, youths' violence may influence their family relationships, relationships between their families and community members, and their exposure to violence and delinquent peers. It is much less likely that youths' prior violence leads to residence in a disadvantaged community. Thus, the ordering of variables in our models corresponds to our theoretical expectations about temporal order.

[11]Although these indicators do not capture all that is likely important about a criminogenic street context, they do capture many of the elements of street context discussed in literature addressing oppositional or criminal street milieus (e.g., Sampson and Wilson 1995; Anderson 1999). Future quantitative research would benefit from inclusion of more direct assessments of neighborhood culture, not only context, such as some measure of aggregated neighborhood attitudes about violence and definitions favoring using violence as a means of gaining respect. Unfortunately, such measures are currently unavailable in datasets containing macro- and microlevel information on communities and violence.

[12]While this misses some situations of violence to which youths may be exposed, especially most instances of family violence, it does capture exposure to serious violence—namely stabbing—occurring in the street context. This is the only variable representing this construct available in the data and it clearly captures exposure to extreme violence.

[13]In a supplementary analysis, we verified that the effect of witnessing serious violence remains significant in a model in which self-reported neighborhood crime is controlled.

## REFERENCES

Akers, Ronald. 1998. *Social Learning and Social Structure*. Boston, MA: Northeastern University Press.

Alba, Richard D. and John R. Logan. 1993. "Minority Proximity to Whites in Suburbs—An Individual Level Analysis of Segregation." *American Journal of Sociology* 98:1388–427.

Alba, Richard D., John R. Logan, and Paul E. Bellair. 1994. "Living with Crime: The Implications of Racial/Ethnic Differences in Suburban Location." *Social Forces* 73:395–434.

Anderson, Elijah. 1997. "Violence and the Inner-City Street Code." Pp. 1–29 in *Violence and Childhood in the Inner City*, edited by Joan Mccord. New York: Cambridge University Press.

———. 1999. *Code of the Street: Decency, Violence, and the Moral Life of the Inner City*. New York: W.W. Norton.

Aneshensel, Carol S. and Clea A. Sucoff. 1996. "The Neighborhood Context of Adolescent Mental Health." *Journal of Health and Social Behavior* 37:293–310.

Baller, Robert D., Luc Anselin, Steven F. Messner, Glenn Deane, and Darnell F. Hawkins. 2001. "Structural Covariates of U.S. County Homicide Rates: Incorporating Spatial Effects." *Criminology* 39:561–90.

Bellair, Paul. 1997. "Social Interaction and Community Crime: Examining the Importance of Neighborhood Networks." *Criminology* 35:677–703.

Browning, Christopher R., Seth F. Feinberg, and Robert D. Dietz. 2004. "The Paradox of Social Organization: Networks, Collective Efficacy, and Violent Crime in Urban Neighborhoods." *Social Forces* 83:503–34.

Bursik, Robert J., Jr. 1984. "Urban Dynamics and Ecological Studies of Delinquency." *Social Forces* 63:393–413.

Bursik, Robert J., Jr. and Harold G. Grasmick. 1993. *Neighborhoods and Crime*. New York: Lexington.

Cattarello, Anne M. 2000. "Community-Level Influences on Individuals' Social Bonds, Peer Associations, and Delinquency: A Multilevel Analysis." *Justice Quarterly* 17:33–61.

Chantala, Kim and Joyce Tabor. 1999. "Strategies to Perform Design-Based Analysis Using the Add Health Data." Carolina Population Center University of North Carolina at Chapel Hill. Retrieved September 6, 2006 (http://www.cpc.unc.edu/projects/addhealth/files/weight1.pdf).

Coleman, James S. 1988. "Social Capital in the Creation of Human Capital." *American Journal of Sociology* 94(Supplement):S95–S120.

———. 1990. *Foundations of Social Theory*. Cambridge, MA: Belknap Press of Harvard University Press.

Crutchfield, Robert D., Ann Glusker, and George S. Bridges. 1999. "A Tale of Three Cities: Labor Markets and Homicide." *Sociological Focus* 32:65–83.

Elliott, Delbert S., William Julius Wilson, David Huizinga, Robert J. Sampson, Amanda Elliott, and Bruce Rankin. 1996. "The Effects of Neighborhood Disadvantage on Adolescent Development." *Journal of Research in Crime and Delinquency* 33:389–426.

Fagan, Jeffrey and Deanna Wilkinson. 1998. "Guns, Youth Violence, and Social Identity in Inner Cities." Pp. 105–88 in *Crime and Justice*, Vol. 24, edited by Michael Tonry and Mark Moore. Chicago, IL: University of Chicago Press.

Furstenberg, Frank F., Thomas Cook, Jacquelyn Eccles, Glenn Elder, and Arnold Sameroff. 1999. *Managing to Make It: Urban Families and Adolescent Success*. Chicago, IL: University of Chicago Press.

Gephart, Martha A. 1997. "Neighborhoods and Communities as Contexts for Development." Pp 1–43 in *Neighborhood Poverty: Context and Consequences for Children*, Vol. 1, edited by Jeanne Brooks-Gunn, Greg J. Duncan, and Lawrence Aber. New York: Russell Sage Foundation.

Gottfredson, Denise C., Richard J. McNeil, III, and Gary D. Gottfredson. 1991. "Social Area Influences on Delinquency: A Multilevel Analysis." *Journal of Research in Crime and Delinquency* 28:197–226.

Hagan, John, Ross MacMillan, and Blair Wheaton. 1996. "New Kid in Town: Social Capital and the Life Course Effects of Family Migration on Children." *American Sociological Review* 61:368–85.

Hagan, John and Bill McCarthy. 1997. *Mean Streets: Youth Crime and Homelessness*. New York: Cambridge University Press.

Harris, Kathleen Mullan, Francesca Florey, Joyce Tabor, Peter S. Bearman, Jo Jones, and J. Richard Udry. 2003. *The National Longitudinal Study of Adolescent Health: Research Design*. Retrieved September 6, 2006 (http://www.cpc.unc.edu/projects/addhealth/design).

Heitgerd, Janet L. and Robert J. Bursik, Jr. 1987. "Extracommunity Dynamics and the Ecology of Delinquency." *American Journal of Sociology* 92:775–87.

Hirschi, Travis. 1969. *Causes of Delinquency*. Berkeley, CA: University of California Press.

Hunter, Albert. 1985. "Private, Parochial, and Public Orders: The Problem of Crime and Incivility in Urban Communities." Pp. 230–42 in *The Challenge of Social Control, Citizenship, and*

*Institution Building in Modern Society*, edited by Gerald D. Suttles and Mayer N. Zald. Norwood, NJ: Ablex.

Johnstone, John W. C. 1978. "Juvenile Delinquency and Family: Contextual Interpretation." *Youth and Society* 9:299–313.

Kasarda, John D. and Morris Janowitz. 1974. "Community Attachment in Mass Society." *American Sociological Review* 39:328–39.

Krivo, Lauren J. and Ruth D. Peterson. 1996. "Extremely Disadvantaged Neighborhoods and Urban Crime." *Social Forces* 75:619–50.

———. 2000. "The Structural Context of Homicide." *American Sociological Review* 65:547–59.

Krivo, Lauren J., Ruth D. Peterson, Helen Rizzo, and John Reynolds. 1998. "Race Segregation and the Concentration of Disadvantage: 1980–1990." *Social Problems* 45:61–80.

Kubrin, Charis E. and Ronald Weitzer. 2003a. "New Directions in Social Disorganization Theory." *Journal of Research in Crime and Delinquency* 40:374–402.

———. 2003b. "Retaliatory Homicide: Concentrated Disadvantage and Neighborhood Culture." *Social Problems* 50:157–80.

Land, Kenneth C., Patricia L. McCall, and Lawrence E. Cohen. 1990. "Structural Covariates of Homicide Rates: Are There Any Invariances across Time and Social Space?" *American Journal of Sociology* 95:922–63.

Lipsitz, S. H., K. Kim, and L. Zhao. 1994. "Analysis of Repeated Categorical Data Using Generalized Estimating Equations." *Statistics in Medicine* 13:1149–63.

Liska, Allen E. and Paul E. Bellair. 1995. "Violent Crime Rates and Racial Composition: Convergence over Time." *American Journal of Sociology* 101:578–610.

Logan, John R., Richard D. Alba, and Shu-Yin Leung. 1996. "Minority Access to White Suburbs: A Multiregional Comparison." *Social Forces* 74:851–81.

Markowitz, Fred E., Paul E. Bellair, Allen E. Liska, and Jianhong Liu. 2001. "Extending Social Disorganization Theory: Modeling the Relationships between Cohesion, Disorder, and Fear." *Criminology* 39:293–319.

Massey, Douglas S. 1985. "Ethnic Residential Segregation: A Theoretical Synthesis and Empirical Review." *Sociology and Social Research* 69:315–50.

———. 1990. "American Apartheid: Segregation and the Making of the Underclass." *American Journal of Sociology* 96:329–57.

Massey, Douglas S. and Nancy A. Denton. 1988. "The Dimensions of Residential Segregation." *Social Forces* 67:281–315.

———. 1993. *American Apartheid: Segregation and the Making of the Underclass*. Cambridge, MA: Harvard University Press.

Massey, Douglas S. and Eric Fong. 1990. "Segregation and Neighborhood Quality: Blacks, Hispanics, and Asians in the San Francisco Metropolitan Area." *Social Forces* 69:15–32.

Massey, Douglas S. and Andrew B. Gross. 1991. "Explaining Trends in Racial Segregation, 1970–1980." *Urban Affairs Review* 27:13–35.

McNulty, Thomas L. and Paul E. Bellair. 2003a. "Explaining Racial and Ethnic Differences in Serious Adolescent Violent Behavior." *Criminology* 41:709–46.

———. 2003b. "Explaining Racial and Ethnic Differences in Adolescent Violence: Structural Disadvantage, Family Well-Being, and Social Capital." *Justice Quarterly* 20:1–31.

Morenoff, Jeffrey D. and Robert J. Sampson. 1997. "Violent Crime and the Spatial Dynamics of Neighborhood Transition in Chicago." *Social Forces* 76:31–64.

The Sociological Quarterly 47 (2006) 723–753 © 2006 Midwest Sociological Society

Stacy De Coster, Karen Heimer, and Stacy M. Wittrock    Neighborhood Disadvantage and Violence

Morenoff, Jeffrey D., Robert J. Sampson, and Stephen W. Raudenbush. 2001. "Neighborhood Inequality, Collective Efficacy, and the Spatial Dynamics of Urban Violence." *Criminology* 39:517–59.

Osgood, D. Wayne, Lloyd D. Johnston, Patrick M. O'Malley, and Jerald G. Bachman. 1988. "The Generality of Deviance in Late Adolescence and Early Adulthood." *American Sociological Review* 53:81–93.

Parker, Karen F. and Tracy Johns. 2002. "Urban Disadvantage and Types of Race-Specific Homicide: Assessing the Diversity in Family Structures in the Urban Context." *Journal of Research in Crime and Delinquency* 39:277–303.

Peeples, Faith and Rolf Loeber. 1994. "Do Individual Factors and Neighborhood Context Explain Ethnic Differences in Juvenile Delinquency?" *Journal of Quantitative Criminology* 10:141–57.

Peterson, Ruth D. and Lauren J. Krivo. 1999. "Racial Segregation, the Concentration of Disadvantage, and Black and White Homicide Victimization." *Sociological Forum* 14:465–93.

Peterson, Ruth D., Lauren J. Krivo, and Mark A. Harris. 2000. "Disadvantage and Neighborhood Violent Crime: Do Local Institutions Matter?" *Journal of Research in Crime and Delinquency* 31:31–63.

Rosenfeld, Richard, Steven F. Messner, and Eric P. Baumer. 2001. "Social Capital and Homicide." *Social Forces* 80:283–309.

Rountree Wilcox, Pamela and Kenneth C. Land. 1996. "Burglary Victimization, Perceptions of Crime Risk, and Routine Activities: A Multilevel Analysis across Seattle Neighborhoods and Census Tracts." *Journal of Research in Crime and Delinquency* 33:147–80.

Sampson, Robert J. 1985. "Race and Criminal Violence: A Demographically Disaggregated Analysis of Urban Homicide." *Crime and Delinquency* 31:47–82.

———. 1997. "Collective Regulation of Adolescent Misbehavior: Validation Results from 80 Chicago Neighborhoods." *Journal of Adolescent Research* 12:277–44.

———. 2004. "Networks and Neighbourhoods: The Implications of Connectivity for Thinking about Crime in the Modern City." Pp. 157–66 in *Network Logic: Who Governs in an Interconnected World?* edited by Helen McCarthy, Paul Miller, and Paul Skidmore. London: Demos.

Sampson, Robert J. and W. Byron Groves. 1989. "Community Structure and Crime: Testing Social Disorganization Theory." *American Journal of Sociology* 94:774–802.

Sampson, Robert J. and Jeffrey D. Morenoff. 2004. "Spatial (Dis)Advantage and Homicide in Chicago Neighborhoods." Pp. 145–70 in *Spatially Integrated Social Science*, edited by Michael Goodchild and Donald Janelle. New York: Oxford University Press.

Sampson, Robert J., Jeffrey D. Morenoff, and Thomas Gannon-Rowley. 2002. "Assessing Neighborhood Effects: Social Processes and New Directions in Research." *Annual Review of Sociology* 28:443–78.

Sampson, Robert J. and Stephen W. Raudenbush. 1999. "Systematic Social Observation of Public Spaces: A New Look at Disorder in Neighborhoods." *American Journal of Sociology* 105:603–51.

Sampson, Robert J., Stephen W. Raudenbush, and Felton Earls. 1997. "Neighborhoods and Violent Crime: A Multilevel Study of Collective Efficacy." *Science* 277:918–24.

Sampson, Robert J. and William Julius Wilson. 1995. "Race, Crime, and Urban Inequality." Pp. 37–54 in *Crime and Inequality*, edited by John Hagan and Ruth D. Peterson. Stanford, CA: Stanford University Press.

Shaw, Clifford R. and Henry D. McKay. 1942. *Juvenile Delinquency and Urban Areas*. Chicago, IL: University of Chicago Press.

Neighborhood Disadvantage and Violence          Stacy De Coster, Karen Heimer, and Stacy M. Wittrock

Shihadeh, Edward S. and Nicole Flynn. 1996. "Segregation and Crime: The Effect of Black Social Isolation on the Rates of Black Urban Violence." *Social Forces* 74:1325–52.

Shihadeh, Edward S. and Darrell J. Steffensmeier. 1994. "Economic Inequality, Family Disruption, and Urban Black Violence—Cities as Units of Stratification and Social Control." *Social Forces* 73:729–51.

Short, James. 1997. *Poverty, Ethnicity, and Violent Crime.* Boulder, CO: Westview Press.

Simcha-Fagan, Ora and Joseph E. Schwartz. 1986. "Neighborhood and Delinquency: An Assessment of Contextual Effects." *Criminology* 24:667–99.

Simons, Ronald L, Christine Johnson, Jay Beaman, Rand D. Conger, and Les B. Whitbeck. 1996. "Parents and Peer Group as Mediators of the Effect of Community Structure on Adolescent Problem Behavior." *American Journal of Community Psychology* 24:145–65.

Skogan, Wesley. 1990. *Disorder and Decline: Crime and the Spiral of Decay in American Cities.* New York: Free Press.

South, Scott J. and Glenn Deane. 1993. "Race and Residential Mobility: Individual Determinants and Structural Constraints." *Social Forces* 72:147–67.

South, Scott J. and Steven S. Messner. 2000. "Crime and Demography: Multiple Linkages, Reciprocal Relations." *Annual Review of Sociology* 26:83–106.

Sutherland, Edwin H. 1947. *Principles of Criminology,* 4th ed. Philadelphia, PA: Lippincott.

Taylor, Ralph B. and Jeanette Covington. 1988. "Neighborhoods Changes in Ecology and Violence." *Criminology* 26:553–89.

Udry, J. Richard. 2003. *The National Longitudinal Study of Adolescent Health (Add Health), Waves I & II, 1994–1996; Wave III, 2001–2002* [MRDF]. Chapel Hill, NC: Carolina Population Center, University of North Carolina at Chapel Hill.

Vélez, Maria B. 2001. "The Role of Public Social Control in Urban Neighborhoods: A Multi-Level Analysis of Victimization Risk." *Criminology* 39:837–64.

Vélez, Maria B, Lauren J. Krivo, and Ruth D. Peterson. 2003. "Structural Inequality and Homicide: An Assessment of the Black-White Gap in Killings." *Criminology* 41:645–72.

Warner, Barbara. 2003. "The Role of Attenuated Culture in Social Disorganization Theory." *Criminology* 41:73–97.

Warner, Barbara D. and Pamela Wilcox Rountree 1997. "Local Social Ties in a Community and Crime Model: Questioning the Systemic Nature of Informal Social Control." *Social Problems* 44:520–36.

Wilcox, Pamela, Kenneth C. Land, and Scott A. Hunt. 2003. *Criminal Circumstance: A Dynamic Multicontextual Criminal Opportunity Theory.* New York: Aldine de Gruyter.

Wilson, William Julius. 1987. *The Truly Disadvantaged: The Inner City, the Underclass, and Public Policy.* Chicago, IL: University of Chicago Press.

———. 1996. *When Work Disappears: The World of the New Urban Poor.* New York: Knopf/Random House.

## APPENDIX A. Description of Variables

*WAVE 1 INDIVIDUAL/FAMILY STATUS CHARACTERISTICS*

| | |
|---|---|
| Youth's Sex | Binary variable, coded 1 if the youth is male, 0 if female. (youth data) |
| Youth's Black Racial Status | Binary variable, coded 1 if youth is black, 0 if non-black. (youth data) |
| Youth's Latino Ethnicity | Binary variable, coded 1 if the youth is Latino, and 0 otherwise. (youth data) |
| Youth's Age | Youth's age in years, ranging from 12 to 21. (youth data) |
| Female-Headed Household | Binary variable, coded 1 if female-headed household, 0 if not female-headed household. We constructed this variable using the household roster items from the youth interview, which allowed us to identify all persons living in the youth's home and their relationship to the youth. If a respondent reported living with only a residential mother, aunt, grandmother, or any combination of the three, and if there was no male adult present in the household, they were considered to be living in a female-headed household. Residential mother includes biological mother, stepmother, adoptive mother, foster mother, or other mother. (youth data) |
| Parent Education High School Grad or Less | Binary variable, coded 1 if highest level of education of the most highly educated parent was high school degree or less, and 0 otherwise. If the household was a single-parent household, we measured parent's education as the highest level of education achieved by the single parent. If the household was a two-parent household, we measured parent's education as the highest level achieved by either parent. If parent data were missing, we substituted the youth's report of parents' education. (parent and youth data) |
| Parent Receives Public Assistance | Binary variable, coded as 1 if the parent receives public assistance, such as food stamps, AFDC or a housing subsidy, 0 if no type of pubic assistance is received. Receipt of public assistance is measured by the parent respondent's self-report of at least one of the following conditions: parent or spouse received public assistance, generally; any member of the household received AFDC in the last month; any member of the household received food stamps in the last month; and any member of the household received a housing subsidy or lived in public housing in the last month. Parent's reports of welfare receipt were supplemented by the youth's report that his/her residential mother and/or residential father received some form of public assistance to allow for recovery of some cases where parents' reports were missing. (parent and youth data) |

Neighborhood Disadvantage and Violence    Stacy De Coster, Karen Heimer, and Stacy M. Wittrock

Prior Violence    Range of violent delinquency in which the youth reported involvement during the 12 months prior to the wave 1 interview. Youth were asked whether (in the past 12 months) they had engaged in the following: a serious fight, used or threatened to use a weapon to get something from someone, hurt someone badly enough to need bandages or care from a doctor or nurse, shot or stabbed someone. We also included youths' reports of whether they had ever used a weapon in a fight, to allow for greater comparability with the wave 2 measure of violence, which includes youth reports of using a weapon in a fight *in the past 12 months*. We coded any involvement in each of these behaviors 1, and summed across the items to produce a six-category variable ranging from 0–5. (youth data)

### WAVE 1 COMMUNITY CONTEXT

Urban Neighborhood    Binary variable, coded 1 if neighborhood is completely urbanized, and 0 otherwise. (contextual data)

Community Disadvantage    Principle component score. The component includes proportion of the population that is black, proportion of households that are female-headed households with own children and no husband present, the proportion of males ever married that are separated or divorced, total unemployment rate, male unemployment rate, median household income, and the proportion of individuals with income in 1989 below the poverty line. All items were measured at the census-tract level. (contextual data) (Cronbach's $\alpha = 0.74$)

### WAVE 1 CONVENTIONAL SOCIAL CAPITAL

Network Closure    Parent response to the question, "How many parents of your child's friends have you talked to in the last four weeks?" (Coded 0 = none; 1 = one; 2 = two; 3 = three; 4 = four; 5 = five; 6 = six or more) (parent data)

Parents' Participation in Organizations    Sum of parent responses to four items about involvement in organizations. The items are coded 1 if parents reported participating in the following, and 0 otherwise: Parent/teacher organization; Hobby or sports group, such as a bowling team or ham radio club; Civic or social organization, such as Junior League, Rotary, or Knights of Columbus; school fund-raising or volunteer work for youth's school, such as supervising lunch, chaperoning a field trip, etc. (parent data)

| | |
|---|---|
| Collective Supervision | Mean of parent responses to the following questions (coded as 1 = definitely would not, 2 = probably would not, 3 = might, 4 = probably would, 5 = definitely would): <br> •"If you saw a neighbor's child getting into trouble, would you tell your neighbor about it?" <br> •"If a neighbor saw your child getting into trouble, would your neighbor tell you about it?" <br> (parent data) |
| Family Cohesiveness | Principle component score created from the youth data using principle components analysis. (Cronbach's $\alpha = 0.78$) The component includes the following items (coded as 1 = not at all, 2 = very little, 3 = somewhat, 4 = quite a bit, 5 = very much) <br> "How much do you feel that your family pays attention to you?" <br> "How much do you feel that people in your family understand you?" <br> "How much do you feel that you and your family have fun together?" <br> (youth data) |

*WAVE 1 CRIMINOGENIC STREET CONTEXT*

| | |
|---|---|
| Deviant Peer Associations | Mean of youth reports of their friends' involvement in drugs and smoking. The items included in the scale are as follows (coded 0 to 3): <br> "Of your three best friends, how many smoke at least one cigarette a day?" <br> "Of your three best friends, how many drink alcohol at least once a month?" <br> "Of your three best friends, how many use marijuana at least once a month?" <br> (Cronbach's $\alpha = 0.77$) (youth data) |
| Accessibility of Guns | Binary variable of youth report of the accessibility of guns in her/his home, coded 1 if easily accessible and 0 if not easily accessible. (youth data) |
| Exposure to Violence | Binary variable of youth report that she/he witnessed a stabbing in the previous year, coded 1 if yes and 0 if no. (youth data) |
| Expectation of Lethal Victimization | Youth report of her/his perception that she/he could be killed by age 21 (coded as 1 = almost no chance; 2 = some chance, but probably not; 3 = a 50–50 chance; 4 = a good chance; 5 = almost certain). (youth data) |

| Past Violent Victimization | Sum of two items from the youth interview capturing personal violent victimizations in the previous year, including being shot and being stabbed. The items are each coded as 1 if the event was experienced once or more, and 0 if the event was never experienced. (youth data) |

### WAVE 2 YOUTH VIOLENCE

| Violent Delinquency | This is the range of types of violent delinquency in which the youth reported involvement during the 12 months prior to the wave 2 interview. Youths were asked whether (in the past 12 months) they had engaged in the following: a serious fight, used a weapon in a fight, used or threatened to use a weapon to get something from someone, hurt someone badly enough to need bandages or care from a doctor or nurse, you have shot or stabbed someone. We coded any involvement in each of these behaviors 1, and summed across the items to produce a six-category variable ranging from 0–5. (youth data) |

The Sociological Quarterly 47 (2006) 723–753 © 2006 Midwest Sociological Society