# EXHIBIT  B

Journal of Research in Crime
and Delinquency
Volume 43 Number 4
November 2006  326-356
© 2006 Sage Publications
10.1177/0022427806291262
http://jrc.sagepub.com
hosted at
http://online.sagepub.com

# The Impact of Community Disadvantage on the Relationship between the Family and Juvenile Crime

Carter Hay
*Florida State University, Tallahassee*
Edward N. Fortson
*Washington State University, Pullman*
Dusten R. Hollist
*University of Montana, Missoula*
Irshad Altheimer
*Wayne State University, Detroit, MI*
Lonnie M. Schaible
*Eastern Washington University, Cheney*

Prior research on the family has identified many variables significantly associated with criminal involvement, including such things as parental supervision and discipline and the quality of the parent-child relationship. However, little attention has been devoted to the possibility that the effects of these variables on crime depend on characteristics of the social context in which a family resides. Using data from a national sample of adolescents, the authors examined how the effects of key family variables depend on two indicators of a community's level of disadvantage: its objective level of community poverty (as indicated by U.S. census data) and its perceived inadequacy as a place to raise children (as rated by parents). The analysis suggests that community disadvantage significantly amplifies the effects on crime of problems in the family environment. The implications of this conclusion for criminological theory and future research on the causes of crime are addressed.

***Keywords:*** *family; parenting; community disadvantage; crime; moderated effects*

**Authors' Note:** We would like to thank Eric Baumer for his input regarding the use of the 1980 census data file and Tom Blomberg, Ted Chiricos, and Gary Kleck for their helpful comments on earlier drafts of this article. Correspondence concerning this article should be addressed to Carter Hay, Florida State University, College of Criminology and Criminal Justice, Tallahassee, FL 32306-1127; e-mail: chay@fsu.edu.

326

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized
distribution.

In criminologists' search for the causes of crime, perhaps no social institution has received more attention than the family. This work has identified many variables significantly associated with criminal involvement, the most important of which relate to the quality of the parent-child relationship and the extent to which parents effectively supervise behavior and discipline acts of deviance (Loeber and Stouthamer-Loeber 1986; Simons, Simons, and Wallace 2004). The effects of these variables persist even in studies that use longitudinal data (Rankin and Wells 1990), account for key sources of spuriousness (Sampson and Laub 1993; Wright and Cullen 2001), and use multiagent, multimodal measures of family dynamics (Larzelere and Patterson 1990).

Important questions still remain, however, in this area of research. It still is not clear, for example, which theories best explain the effects of family variables on crime (Brezina 1998; Hay 2001). Much also is unknown about whether the effects of the family vary significantly over the course of adolescence (Jang 1999; Thornberry 1987). Controversy also persists regarding what portion of family effects are a function of shared genetic characteristics rather than the actions of parents (Harris 1998; Wright and Cullen 2001).

One additional question, the focus of our analysis, involves the issue of social context and the role it may play in moderating family effects. Specifically, the effects of family variables may vary according to the social context in which a family resides. As Loeber and Stouthamer-Loeber (1986:128) argued, "family factors never operate in a vacuum but [instead] take place against a backdrop of other influences," including such things as the community, the school system, and the economic or cultural circumstances of cities, regions, and even nations. These contexts often are relevant to crime, and they may significantly alter the consequences of different family variables.

One might hypothesize, for example, that the effects of parent-child attachment would be different in an economically disadvantaged community than they would be elsewhere. Such a community might be expected to strengthen the effects of weak attachment. Poor communities may have diminished levels of community social control (Bursik and Grasmick 1993; Sampson, Raudenbush, and Earls 1997) that provides weakly attached individuals greater access to criminal opportunities and peer groups. This in turn may allow weak attachment to parents to more easily lead to crime.

Little research has been done to test this hypothesis or any others reflecting the idea that family effects are moderated by features of the social context. This study addressed this void by empirically examining whether key family variables have effects that depend on social context. Social context

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

was examined in terms of the level of community disadvantage, which is an important moderator to consider when examining the family-crime relationship. First, the community is the dimension of social context perhaps most proximate to families and individuals and therefore most likely to play a moderating role (Farrington, Sampson, and Wikstrom 1993; Wikstrom and Loeber 2000). Second, much prior research has revealed that various indicators of community disadvantage predict community-level crime rates (Bursik and Grasmick 1993; Sampson and Groves 1989). Community disadvantage therefore should affect juveniles' immediate opportunities and pressures for crime, thus affecting the extent to which family problems are predictive of juvenile crime.

This issue was examined by testing the hypothesis that community disadvantage amplifies the effects of key family variables on crime; these effects were predicted to become stronger as community disadvantage increased. This hypothesis follows in part from an emerging idea that exposure to multiple causes of crime produces an increase in crime that exceeds the sum of those causes' independent effects (Agnew 2005; Moffitt 1993; Wright et al. 2001). Put differently, the causes of crime may interact with one another, such that the effects of each are amplified by the effects of others. In Agnew's (2005) words, "a cause is more likely to increase crime when other causes are present" (p. 112). Some life-course and developmental theories make a similar argument in suggesting that the effects of criminal propensity on crime are greatest for those who also find themselves in criminogenic social environments (see Moffitt 1993; Wright et al. 2001, 2004). In short, co-occurring causes of crime likely amplify the effects of one another. When this logic is applied to the present topic, it suggests that family-related causes of crime should have their greatest effect in disadvantaged communities that may themselves promote crime.

The amplification hypothesis also is supported by two theories prominently used to study the family-crime relationship: Agnew's (1992) general-strain theory and Hirschi's (1969) social-bonding theory. Agnew, for example, argued that the effects of strain (including family-related strain) are greatest when strain is combined with factors that promote the use of criminal adaptations. Residence in a disadvantaged community was cited as one such factor (Agnew 1992:72-73) because such communities may promote values, goals, and identities that are conducive to crime. This in turn should lead strain to more easily result in crime. Similarly, Hirschi (1969) argued that differences in crime between those with strong and weak bonds (including family bonds) are greatest in environments rife with criminal influences (such as might be true in disadvantaged communities).

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized
distribution.

Individuals with weak bonds were seen as "susceptible to pro-delinquent influences in [their] environment," while those with strong bonds were seen as "relatively immune to these influences" (Hirschi 1969:161). Thus, in Hirschi's words, "the greater the exposure to criminal influences, the greater the differences in delinquent activity between high- and low-stake boys" (p. 161).

Drawing from this theoretical foundation, in this study, we tested the hypothesis that family effects are amplified by community disadvantage with data from the National Survey of Children (NSC), a panel study of U.S. adolescents and their families (see Zill et al. 1990). These data have been useful in other investigations of adolescent outcomes (Agnew et al. 2002; Baumer and South 2001) and were especially useful for this project because the NSC's rich set of family items is combined with the opportunity it affords for measuring key characteristics of the community. Before further discussing the data, however, we place the family-crime connection in an empirical and theoretical context. We do so first by describing conclusions from prior research and discussing how the major criminological theories have been applied to the study of the family. We then consider in greater detail what predictions these theories make regarding how community disadvantage might moderate the family-crime relationship and what existing support there is for these predictions.

## Research and Theory on the Family

The family's impact on crime ranks among the earliest topics studied in criminology, with research dating to Dugdale's (1877) analysis of the "Jukes" criminal family and Healy's (1915) observations of official delinquents in Chicago. A large body of research in this area reveals many family variables significantly related to crime. Most notably, juveniles commit fewer criminal acts when they are emotionally attached to parents (Cernkovich and Giordano 1987; Sampson and Laub 1993; Wright and Cullen 2001), exposed to consistent parental supervision (Hay 2001; Hirschi 1969; Larzelere and Patterson 1990), reinforced when they engage in prosocial behavior (Catalano and Hawkins 1996; Huang et al. 2001), and exposed to consistent, fair, and nonphysical parental discipline (Larzelere and Patterson 1990; Laub and Sampson 1988; Rankin and Wells 1990).

The effects of these variables tend to be moderate in magnitude (Agnew 1991; Cernkovich and Giordano 1987; Van Voorhis et al. 1988). They are found, however, even in recent studies that were more rigorous than the

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

classic works that inspired interest in the family (Glueck and Glueck 1950; Hirschi 1969; Nye 1958). Significant family effects are found, for example, even when controlling for a child's temperament or involvement in prior antisocial behavior (Laub and Sampson 1988; Wells and Rankin 1988). Family effects have also been observed in longitudinal studies (Rankin and Wells 1990; Simons et al. 1998) and in studies that assessed family processes with multiple methods that measured the perspectives of parents, children, and trained observers (Larzelere and Patterson 1990; Simons et al. 1998).

Although most major crime theories incorporate the role of the family, control theories have guided much of the work just described (Gottfredson and Hirschi 1990; Hirschi 1969; Nye 1958; Sampson and Laub 1993). These theories emphasize that humans are inherently antisocial and that parents are the primary agents of socialization responsible for repressing this antisociality. Hirschi's (1969) control theory placed special importance on indirect parental control coming from a child's emotional attachment to parents. Other versions of control theory (Nye 1958; Sampson and Laub 1993) emphasize direct parental controls that involve overt efforts to set rules, supervise behavior, and use discipline. Similarly, Gottfredson and Hirschi's (1990) self-control theory argues that direct parental controls affect the child's self-control, which in turn is the key explanation for involvement in crime over the life course.

Theories such as general-strain theory (Agnew 1992, 2001) and social-learning theory (Akers 1998; Patterson 1982) also are relevant to studying the family. They differ from control theory and one another not so much in the family dynamics they emphasize but in the labels they attach to them and the mechanisms argued to mediate family-crime relationships. Agnew's (1992) theory considers negative family relationships sources of strain that affect crime by increasing negative emotions such as anger. Indeed, Agnew (1985, 2001) argued that family strains are among the most consequential strains that adolescents face. Thus, what control theorists see as relationships that weaken social bonds or self-control, strain theorists see as family strain that evokes anger.

Social-learning theory (Akers 1998; Patterson 1982), on the other hand, views the family in terms of its reinforcements and punishments for criminal or deviant behavior. It is often used to study the effects of peer groups rather than parents, because of the view that parents almost always try to discourage criminal acts by their children (Warr 1993). As Akers (1998:54-56, 62-63) noted, however, parents can unintentionally promote crime by behaving aggressively themselves (perhaps in their use of discipline) or by not properly

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

punishing bad behavior and reinforcing good behavior. These things should increase crime by modeling deviant behavior and affecting a child's later choice of peer associations.

Each of these theories receives some support in family-crime research. Comparative tests that consider which theory's intervening mechanisms best explain the effects of the family generally have not been done (see Brezina 1998 for an exception). More common are studies that examine one specific theory. Many support the family-related arguments of control theories (e.g., Cernkovich and Giordano 1987; Sampson and Laub 1993), but the family-related arguments of general-strain theory (Agnew 1993; Hay 2003) and social-learning theory (Patterson and Dishion 1985; Warr 1993) also have been supported.

## Community Disadvantage as a Moderator of Family Effects

Our attention now turns to the idea that the effects of the family environment may be moderated by a feature of the social context such as community disadvantage. There is an emerging view within criminology that supports this possibility. Specifically, some scholars recently have argued that co-occurring causes of crime may amplify the effects of one another, such that a given cause has greater effects when it exists in conjunction with other causes.

This idea is reflected in two theories prominently used to study the family-crime relationship in particular. The first is Agnew's (1992) general-strain theory, which emphasizes that the effects of strain (including family-related strain) on crime depend on factors that promote the use of criminal adaptations. Among the many factors cited by Agnew are certain "macro-level variables," including residence in a disadvantaged community. Agnew's discussion of this centers on the idea that economically disadvantaged communities are more likely than others to promote cultural values, goals, and identities that are conducive to crime (pp. 72-73). In such communities, strain should be more likely to produce crime, because cultural forces in the community make prosocial responses to strain (e.g., cognitively reinterpreting the strain) less apparent or appealing. In short, a criminogenic community introduces "special constraints that make nondelinquent coping more difficult" (p. 73).

A second theory making arguments consistent with the amplification thesis is Hirschi's (1969) social-control theory. This theory emphasizes that weak social bonds do not compel crime; rather, they simply free one to take

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

advantage of opportunities in which crime advances one's self-interest. By this logic, a weak social bond is most consequential for crime when combined with an environment rich in criminal opportunities, an environment likely to be found in disadvantaged communities (Bursik and Grasmick 1993; Sampson et al. 1997). Thus, the differences in crime between those with strong and weak bonds (including family bonds) will be greatest— they will become amplified—when criminal opportunities are high.

Often neglected from Hirschi's (1969) *Causes of Delinquency* are statements in which he made essentially this argument. In his words, an individual with a weak social bond "is susceptible to pro-delinquent influences in his environment" (p. 161). On the other hand, "the child with a large stake in conformity [a strong social bond] is relatively immune to these influences. The greater the exposure to 'criminal influences' the greater the differences in delinquent activity between high- and low-stake boys" (p. 161). Thus, if we see the family as an important source of social bonds and a disadvantaged community as an important source of criminal influences, these statements are consistent with the amplification thesis.[1]

Additionally, Agnew (2005) recently described the research that broadly supports the idea of amplification and suggested that criminological theory should incorporate the argument that a cause is more likely to increase crime when other causes are present (chap. 6). A significant line of life-course theory and research makes a similar argument in suggesting that criminal propensity (as measured by such things as low self-control) has its most potent effect when combined with social environments that also promote crime. Moffitt (1993), for example, argued that life-course-persistent offending occurs when neuropsychological deficits are combined with a criminogenic family environment. A number of studies have supported this reasoning, finding that co-occurring risks for crime interact to amplify overall levels of crime (Lynam et al. 2000; Tibbetts and Piquero 1999; Wright et al. 2001, 2004).

Some research has looked at this issue with a direct concern for whether family effects in particular are amplified by certain characteristics of the community. On balance, this research provides slight support for the amplification thesis. Specifically, four of the six studies that examined this issue found family effects that were greater in disadvantaged communities (Brody et al. 2003; Lindstrom 1996; Plybon and Kliewer 2001; Rankin and Quane 2002). In a study of Richmond, Virginia, youth, for example, Plybon and Kliewer (2001) found a significant effect of family social cohesion that was greater for those in poor communities. No such interaction was found, however, for variables such as family stress and maternal support. Similarly,

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

in a study of inner-city Chicago families, Rankin and Quane (2002) found that weak monitoring produced behavior problems only for those juveniles living in neighborhoods with low collective efficacy. Again, however, no such interactions were observed for other family variables, including parent-child involvement and family rule setting.

Two other studies found a diminishing role played by community disadvantage: Family effects were weakened in disadvantaged communities. Gorman-Smith, Tolan, and Henry (2000) found that children living in households with exceptional family functioning were less involved in crime than children from other families, but the differences were smallest in neighborhoods with high levels of poverty and crime. Similarly, Simons et al. (2002) found that although inconsistent parental supervision and discipline significantly increased conduct problems, this was less true in communities with high overall levels of childhood conduct problems.

Unfortunately, no clear methodological patterns account for these different findings. Regarding the conceptualization of key variables, sampling, and analytic methods, studies reaching the same conclusion were quite different from one another, whereas those reaching different conclusions generally were quite similar. For example, the two studies finding that community disadvantage diminished family effects used samples that could hardly be more different from one another. Simons et al. (2002) used a mixed-sex sample of preteen African Americans from small towns and cities in Georgia and Iowa, whereas Gorman-Smith et al. (2000) used an all-male, mixed-race sample of 15- to 18-year-olds from inner-city neighborhoods of Chicago. Simons et al.'s study did have much in common, however, with the study of Plybon and Kliewer (2001), who reached an opposite conclusion.

A point to emphasize, however, is that in many respects, each of these studies, regardless of the conclusion reached, provided only a narrow test of the amplification thesis. Each was limited by having drawn its subjects from fairly homogeneous sampling groups, and this was especially true for the studies not supporting the amplification thesis. The sample used by Gorman-Smith et al. (2000), for example, was composed exclusively of boys living in economically disadvantaged neighborhoods in inner-city Chicago. Simons et al.'s (2002) study, on the other hand, was drawn only from youths living in small towns and cities. A principal concern is that within any given study, there may have been insufficient variability with respect to key aspects of community context.

These samples also lacked variability on key demographic characteristics as well. All five U.S. studies used samples that included only African Americans and Latinos. Regarding family structure and age, the samples

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

used by Plybon and Kliewer (2001) and Gorman-Smith et al. (2000) were composed primarily of single-parent households, whereas the samples used by Plybon and Kliewer (2001), Simons et al. (2002), and Brody et al. (2003) were limited to preteens.

A final limiting factor is that each study tended to focus on one or a small set of family variables, with little attention to the overall quality of the family environment. For example, Simons et al. (2002) included measures of parental control and corporal punishment but did not direct attention to the extent of parent-child warmth or attachment (see also Rankin and Quane 2002). Lindstrom (1996), on the other hand, examined the extent of family social interaction but did not address the quality or extent of parental control (see also Plybon and Kliewer 2001).

The point to emphasize, therefore, is that although family effects may be amplified by community disadvantage, new research is needed to more adequately test this hypothesis. Most notably, tests are needed that use samples that come from a diverse range of communities and contain diversity on key demographic characteristics such as race, family structure, and age. New studies also should use a broad set of family measures that, taken together, adequately capture the overall quality of the family environment.

## The Present Study

This study examined whether the effects on crime of six key family variables depend on the level of disadvantage in the community. As described below, this was done with data and measures that addressed the limitations of prior research. We first examined the family variables in terms of their main effects on crime. Our interest was in establishing that they were related to crime in our data just as they were in other studies. We then examined their effects in reference to the central question of our study: Does community disadvantage significantly moderate the effects of these family variables, and if so, does it amplify those effects? Agnew's (1992) general-strain theory, Hirschi's (1969) social-control theory, and emerging ideas about the implications of co-occurring causes of crime suggest that family effects should be amplified by community disadvantage.

### Data

Our analysis used NSC data that were supplemented with data from the 1980 census. The NSC was a three-wave national panel survey of U.S.

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

children and their families. Respondents were first interviewed in 1976, when the children were aged 7 to 11 years, with a follow-up conducted in 1981, when they were aged 12 to 16 years (Zill et al. 1990). The sampling yielded a nationally representative sample of children in the first wave, with the exception that Blacks were oversampled to represent roughly 25 percent of the original sample. The sample used in our analysis included subjects who participated in both the first- and second-wave interviews. Because the NSC was focused on the link between family problems and developmental outcomes for children, the second-wave follow-up oversampled cases in which family problems (in terms of family structure or family functioning) were evident at wave 1. The sampling was designed to include all such cases as well as a large group of stable, married couples and their children. This approach therefore ensured significant variability on the key family variables of interest.

Overall, the rate of response for the follow-up was high: 82 percent of selected cases from wave 1 were reinterviewed for wave 2, yielding a sample of 1,423 cases (Zill et al. 1990). Respondents had an average age of 14 years, and the sample was equally divided between male and female children. Twenty-eight percent of respondents were in single-parent households at the time of the interview, and the sample's median level of household income in 1980 was approximately $20,000. (Appendix A provides the means, standard deviations, and correlations with overall crime of all variables).

In using the NSC, wave 1 data were used to construct control variables that addressed concerns about spuriousness (these controls are described below), whereas wave 2 data were used to construct the measures pertaining to the family, the community, and involvement in crime. The timing of the wave 2 data nicely matched the needs of this particular research question. The age range of 12 to 16 years of respondents captures a period in which involvement in crime becomes more frequent and family dynamics are thought to be of great salience (Thornberry 1987). Additionally, the respondents were old enough to take part in a lengthy interview that inquired about their involvement in crime and patterns of social interaction with their parents.

## Measures

*The family.* The NSC data set contains more extensive family data than are available in most criminological data sets. Its many items pertain to multiple dimensions of family life, and most topics include both mother- and father-specific items. This breadth of family data significantly enhanced our analysis, allowing us to assess the family-crime connection not just with a single family variable but with multiple-item measures for five variables

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

336    Journal of Research in Crime and Delinquency

that have been significant predictors of crime in prior research, and these measures pertain to all parents involved in raising a child.

These items were used to develop measures that closely matched the key family variables emphasized in theory and prior research. Thus, our scale construction was guided by theoretical considerations rather than by exploratory factor analyses. That being said, however, the resulting measures were quite adequate in terms of their internal reliability. Five measures were created that pertained to parent-child relationships and parents' patterns of socialization. The five variables were parent-child attachment, parental monitoring, parental reinforcement of prosocial behavior, parents' use of physical punishment, and parental coercion. With one exception (noted below), each was measured with items answered by the child. These items and scales are briefly described below, and Appendix B provides a more detailed description.

The five measures were coded such that high scorers were exposed to family environments that should increase crime. (This was done because of the ease of describing results in which all hypothesized main effects and interactions are positive). Weak attachment was measured with a 10-item scale (with 8 items from the child and 2 from the mother) with a Cronbach's $\alpha$ value of .76. High scorers on this scale frequently argued with their parents and did not feel close to them. Weak supervision was measured with a 9-item scale ($\alpha = .70$); high scorers were not subject to clear and consistent parental rules regarding how and with whom they spent their time. Weak prosocial reinforcement was measured with an 8-item scale ($\alpha = .79$); high scorers reported that when they behaved properly, their parents were not likely to express approval and show affection. Physical punishment was measured with a 6-item scale ($\alpha = .88$); high scorers reported that parents responded to wrongdoing with spanking or slapping and that this had resulted in bruises or cuts. Coercive discipline pertained to a concept emphasized by social-learning theorists (Patterson 1982) to describe discipline that involves impulsive verbal antagonism of a child. This was measured with a 6-item scale ($\alpha = .61$); high scorers reported that parents responded to rule violations by yelling at them, making fun of them, or acting as if they no longer loved them. Last, our analysis made extensive use of a measure of overall family problems ($\alpha = .54$) that captured the overall quality of the family environment. This measure combined the five variables just described.[2]

*Community disadvantage.* Two measures of community disadvantage are available in the second wave of the NSC data: one objective measure and

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

one perceptual measure. The objective measure pertains to the level of community poverty. The NSC data contain a five-digit ZIP code for each respondent that was used to supplement its data with 1980 census data that contained extensive measures of community poverty. Our measure combined four aspects of poverty aggregated at the ZIP-code level: (1) the average family income, (2) the unemployment rate, (3) the average level of education among heads of households, and (4) the percentage of households receiving some form of welfare assistance. Each was coded such that respondents with high scores lived in communities high in poverty (income and education were reverse coded by subtracting their values from a constant). These four measures were standardized and then averaged to produce an overall scale (which was standardized as well) with an $\alpha$ value of .83.

The principal difference between a ZIP code area and a census tract is that the former generally is larger and more populated; the mean population in a U.S. ZIP code in 1980 was about 6,300, compared with about 4,200 for the average U.S. census tract (Adams 1991). It is important to note that this difference is not extraordinary, and several recent analyses found important results with ZIP-code-level data. For example, South and Baumer (2000) and Baumer and South (2001) found significant effects of ZIP-code-level poverty on adolescent sexual activity and childbearing. Moreover, Brooks-Gunn et al. (1993) found that community effects on school dropout were as large or larger with ZIP code measures as they were with census tract measures.

The second community measure was a perceptual measure in which parents rated their own communities. The advantage of a perceptual measure is that it allows respondents to provide information on the basis of their own views of their communities' boundaries (rather than on the boundaries specified in census data). Moreover, such items allow respondents to comment on features of their communities (such as their appeal as places to raise children) that are not covered in census data. The drawback of a perceptual measure is that the perceptions of a single respondent may lack the validity and reliability of census-derived objective measures. With these strengths and limitations in mind, Burton and Jarrett (2000) suggested that studies should use both objective and perceptual measures when possible.

The perceptual item used here asked respondents to rate their communities "as a place to raise children," with answers being selected from a five-point scale ranging from *excellent* to *poor*. High scorers saw their communities as poor places to raise children. First-wave NSC data indicated that those rating their communities unfavorably perceived them as disordered (e.g., plagued by crime and the public use of alcohol) and as having inadequate resources regarding such things as schools and police protection. Also, the

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

correlations between this item and others suggest its validity as a measure of perceived community weakness: correlations of .36 with the census-based measure of community poverty, −.26 with parental education, and −.38 with family income.

*Crime.* Research on the family-crime relationship has sometimes suffered from a focus on fairly trivial offenses. We focused instead on seven items in the NSC that measure involvement in more serious violations. These were used to construct three category-specific scales (for acts against persons or property, drug use, and police contacts) and one general scale that included all items. For all scales, the items were standardized prior to averaging to prevent more frequent offenses from dominating the scales, and the overall scales were standardized as well.

Acts against persons or property was assessed with a three-item scale ($\alpha$ = .54) measuring juveniles' self-reported involvement in the past year (*never, once, twice,* or *more often*) in vandalism, assaults producing injuries, and theft from stores. Drug use was assessed with two items ($r = .42$) measuring the self-reported use of marijuana or any drug other than marijuana (not counting alcohol and tobacco). Respondents could indicate that they had never used such drugs (coded 0), that they had used them but not in the past two weeks (coded 1), or that they had used them in the past two weeks (coded as 2). Police contacts were measured with two items (one from the parent and one from the child, $r = .56$) inquiring about how often a child had been questioned by the police, with the response categories *never, once, twice,* and *more often.* Police contacts were considered because of research by Dunford and Elliott (1984) and Williams and Gold (1972) indicating that they provide a proxy for high-frequency involvement in a range of serious offenses, some of which were not inquired about in the NSC interviews. Last, a measure of overall crime was computed by averaging all seven items. All were used because a scale including all items was superior (compared with alternative reduced scales) in terms of internal reliability ($\alpha$ = .64), construct validity (with substantially higher correlations with known predictors of crime such as age, sex, and prior problem behavior), and overall explained variance.

## Control Variables

The analyses included a number of control variables to address concerns with spuriousness. Most notably, a family-crime relationship could emerge because the family variables and a child's involvement in crime are explained by the same exogenous characteristics of the household, parents, or child.

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

Thus, we included in all equations the following six demographic and social status variables: sex (male children were coded as the high category), child's age (in years), race or ethnicity (a dummy variable with non-Whites coded as the high category), parental education (years completed), family income (an ordinal measure of total family income), and mother's marital status (a dummy variable with unmarried mothers coded as the high category). Also included as a control was a seven-item scale ($\alpha = .72$) measuring a mother's first-wave assessment of a child's earlier behavior problems. High scorers on this scale were perceived as prone to tantrums, destructive, quick to lose their tempers, high strung and tense, restless, limited in their ability to maintain concentration, and generally difficult to raise. Including this control is critical to estimating the effects of family variables, given evidence that the relationship between parenting and behavior problems is due in part to the effects of a child's behavior and temperament on parents' behavior (Kandel and Wu 1995; Sampson and Laub 1993).[3]

## A Note on the Reporting of Results

Readers are reminded that the family, community, and crime variables were all standardized. Standardized and unstandardized coefficients are therefore the same, and the discussion of findings centers on standardized effects. The scales were standardized because of the need to center measures that are used to create multiplicative interaction terms (Aiken and West 1991). Moreover, standardizing all the measures (including the interaction terms) allows for clearer interpretation of the interactions: Their coefficients can be interpreted in terms of standard deviation unit impacts on family-crime relationships (Tabachnick and Fidell 2001).

# Results

## The Effects of the Family on Crime

The analysis began by determining whether the family variables were consequential for crime. This was first done by examining their effects on the overall crime measure that included all seven crime items. Six ordinary least squares (OLS) regression equations were estimated, with each including all of the control variables: age, sex, race or ethnicity, parental education and income, mother's marital status, and child's wave 1 behavior problems. Along with the controls, each equation also included one of the six family variables under scrutiny.

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

The results for these equations are shown in Table 1 and revealed that all six family variables were significantly related to overall crime in the predicted direction: A weak family environment was associated with greater crime, net of the controls. The standardized effects ranged between .08 and .25, but all were significant at a level of at least $p \leq .01$. The strongest effects were for weak attachment ($B = .25$), overall family problems ($B = .24$), and coercive discipline ($B = .14$).[4]

Next, the same set of equations were estimated for the category-specific measures of crime: acts against persons and property, drug use, and police contacts. With three crime measures and six family measures, 18 equations were estimated overall. Table 2 summarizes the results for these equations, providing the standardized effect and $t$ value for the specific family variable and the $R^2$ value for the overall equation. These results paralleled those obtained with the measure of overall crime, with the exception that the effects and explained variance generally were lower for the category-specific measures of crime than for the overall measure. Nevertheless, in 15 of the 18 equations, the family variable was significantly related to crime, with significant $\beta$ values ranging in magnitude from .06 to .20. The largest effects were for weak attachment ($\beta$ values of .15, .20, and .18) and overall family problems ($\beta$ values of .12, .20, and .16), but the effects of coercive discipline ($\beta$ values of .09, .12, and .08) also were significant for each crime measure. Weak supervision, weak reinforcement, and physical punishment were significantly related to two of the three measures of crime. Taken together, these results show that the family measures used in this study had effects that matched what has been found in prior research.

## Community Disadvantage as a Moderator of Family Effects

Attention then turned to whether the effects of the family variables were moderated by two indicators of community disadvantage: community poverty and perceived community weakness. These interactions were assessed using the overall crime measure as the dependent variable. This measure provided the most comprehensive assessment of respondents' involvement in crime. Additionally, the analyses reported in Tables 1 and 2 revealed more substantively important family effects for this measure than for the category-specific measures of crime.

With little theoretical or empirical basis for dichotomizing our variables, OLS product term analysis was the best approach for examining these interactions (see Aiken and West 1991; Jaccard, Turrisi, and Wan 1990).[5] This method uses an interaction term that is the product of the

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

**Table 1**
**The Effects of Family Problems on Overall Crime**

| Variable | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Age | .16** | .18** | .18** | .21** | .18** | .18** |
| | .10 (.02) | .11 (.02) | .10 (.02) | .12 (.02) | .11 (.02) | .12 (.02) |
| Male | .18** | .16** | .16** | .16** | .17** | .15** |
| | .36 (.05) | .30 (.05) | .29 (.05) | .29 (.05) | .31 (.05) | .30 (.05) |
| Nonwhite | −.01 | −.02 | −.02 | −.02 | −.02 | −.02 |
| | −.02 (.06) | −.04 (.06) | −.05 (.06) | −.04 (.06) | −.05 (.06) | −.04 (.06) |
| Parental education | −.02 | .00 | .01 | .01 | .00 | .00 |
| | −.01 (.01) | .00 (.01) | .01 (.01) | .01 (.01) | .00 (.01) | .00 (.01) |
| Parental income | .03 | .05 | .05 | .04 | .03 | .04 |
| | .02 (.02) | .02 (.02) | .02 (.02) | .02 (.02) | .02 (.02) | .02 (.02) |
| Unmarried mother | .07* | .08* | .09** | .09** | .08* | .09** |
| | .16 (.07) | .17 (.07) | .19 (.07) | .19 (.07) | .17 (.07) | .21 (.07) |
| Problem behavior | .14** | .17** | .17** | .17** | .16** | .15** |
| | .23 (.04) | .26 (.04) | .26 (.04) | .25 (.04) | .24 (.04) | .24 (.04) |
| Weak attachment | .25** | | | | | |
| | .25 (.03) | | | | | |
| Weak supervision | | .10** | | | | |
| | | .09 (.02) | | | | |
| Weak reinforcement | | | .08** | | | |
| | | | .08 (.02) | | | |
| Physical punishment | | | | .09** | | |
| | | | | .08 (.03) | | |
| Coercive discipline | | | | | .14** | |
| | | | | | .13 (.02) | |
| Overall family problems | | | | | | .24** |
| | | | | | | .24 (.03) |
| $R^2$ | .16 | .11 | .11 | .11 | .12 | .16 |

Note: For each variable, the standardized effect is shown in the top row, with the unstandardized effect and the standard error (in parentheses) shown below.
*$p \le .05$; **$p \le .01$ (two-tailed).

predictor (a family variable) and the hypothesized moderator (community disadvantage). Entering the product term into an equation that includes the main effects indicates whether the effects of the family vary across values of community disadvantage. Specifically, the product term's coefficient reveals how the predictor's effect changes in response to a one-unit change in the moderator (Jaccard et al. 1990).

It should be noted that Osgood, Finken, and McMorris (2002) recently suggested that OLS product term analysis with summative, ratio-level

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

**Table 2**
**The Effects of Family Problems on Three Category-Specific Measures of Crime**

| Variable | Acts against Persons or Property | | | Drug Use | | | Police Contacts | | |
|---|---|---|---|---|---|---|---|---|---|
| | $B$ | $t$ | $R^2$ | $B$ | $t$ | $R^2$ | $B$ | $t$ | $R^2$ |
| Weak attachment | .15** | 5.37 | .06 | .20** | 7.68 | .11 | .18** | 7.15 | .15 |
| Weak supervision | .03 | 1.14 | .04 | .11** | 4.32 | .08 | .07** | 2.63 | .12 |
| Weak reinforcement | .02 | .85 | .04 | .10** | 3.83 | .08 | .06* | 2.28 | .12 |
| Physical punishment | .08** | 2.95 | .04 | .06* | 2.23 | .07 | .04 | 1.16 | .12 |
| Coercive discipline | .09** | 3.47 | .05 | .12** | 4.38 | .09 | .08** | 3.00 | .12 |
| Overall family problems | .12** | 4.53 | .05 | .20** | 7.73 | .11 | .16** | 6.37 | .14 |

Note: Each family-problems measure was entered into a separate ordinary least squares equation including controls for age, sex, race, parental education, parental income, mother's marital status, and child's wave 1 problem behavior.
*$p \leq .05$; **$p \leq .01$ (two-tailed).

measures of crime may find significant interactions that are not substantively meaningful. Such crime measures often have skewed, limited, and discrete distributions that may be amenable to revealing significant effects of complex regression terms that test for interactions and curvilinearity. Other scholars have suggested, however, that product term analysis is inherently conservative when used with nonexperimental data (Mazerolle and Maahs 2000; McClelland and Judd 1993). The inability to manipulate the value of the predictors (as can be done in experimental research) produces lower variances for the multiplicative terms and thus lower statistical power. Despite these cautions, product term analysis remains the best understood and most widely recommended method for examining interactions among noncategorical variables (Aiken and West 1991; Jaccard et al. 1990; Tabachnick and Fidell 2001). It therefore continues to be used prominently in recent criminological research (Baron 2004; Tittle and Botchkovar 2005; Wright et al. 2004).

We first considered the interaction between the family and the community in analyses that used overall family problems as the predictor. For both community moderators, an equation was estimated that included the control variables, the main effects for overall family problems and the community moderator, and the multiplicative interaction term. The results for these equations are shown in Table 3, and they indicate that community disadvantage did indeed moderate the effects of overall family problems. Both equations revealed a significant coefficient for the family-community

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

interaction, with $\beta$ values of .08 for the interaction with community poverty and .06 for the interaction with perceived community weakness. Additionally, both equations had an explained variance that represented a small but statistically significant improvement ($p \leq .01$) over equations not containing the interactions (not shown), with $F$ ratios equal to 9.85 and 6.68.

Of central importance are the interaction terms' positive coefficients, which indicate an amplifying role for both moderators: The effects of family problems became greater at high values of community poverty and perceived community weakness. For community poverty, the standardized effect of overall family problems was .22 when community poverty was at its mean. As community poverty increased to one standard deviation above its mean, this effect elevated to .30 (a 36 percent increase in the effect of family problems). Conversely, when community poverty was one standard deviation below its mean, the effect of overall family problems was reduced to .14. The results were similar when perceived community weakness was the moderator. When community weakness increased to one standard deviation above its mean, the standardized effect of overall family problems increased by 27 percent to .28. When community disadvantage was, on the other hand, one standard deviation below its mean, the effect of overall family problems was .16.

We next considered what findings would emerge when using the individual family measures. Prior research generally has emphasized individual measures such as these rather than comprehensive measures that assess the overall quality of the family environment, and this may have affected their findings. To consider this, a product term was created for each possible interaction between the family and community variables, and each was assessed with an equation containing both the main effects and all of the controls.

Table 4 summarizes the results for these equations by providing the standardized coefficient for the family variable and the standardized coefficient and $t$ value for the interaction term. These results suggest an amplifying effect of community disadvantage, but they offer less support for this than what was observed with the composite measure of overall family problems. Only 2 of the 10 equations yielded a significant interaction term. In both cases, this interaction was positive (indicating an amplifying effect of community disadvantage) and involved physical punishment, which was significantly amplified by both community variables. Six of the remaining eight interaction coefficients were positive, but none were significant (with $t$ values ranging from .95 to 1.64).[6]

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

344    Journal of Research in Crime and Delinquency

**Table 3**
**The Interaction between Overall Family Problems and Community**
**Disadvantage for Overall Crime**

| Variable | Interaction with Community Poverty | Interaction with Community Weakness |
|---|---|---|
| Age | .18** | .18** |
| | .12 (.02) | .11 (.02) |
| Male | .15** | .15** |
| | .30 (.05) | .30 (.05) |
| Non-White | −.04 | −.05 |
| | −.08 (.07) | −.10 (.06) |
| Parental education | .01 | .01 |
| | .00 (.01) | .00 (.01) |
| Parental income | .05 | .07 |
| | .03 (.02) | .03 (.02) |
| Unmarried mother | .10** | .09** |
| | .22 (.07) | .21 (.07) |
| Problem behavior | .15** | .14** |
| | .24 (.04) | .22 (.04) |
| Overall family problems | .22** | .22** |
| | .23 (.03) | .22 (.03) |
| Community poverty | .05 | |
| | .05 (.03) | |
| Overall Family Problems × Community Poverty | .08** | |
| | .08 (.03) | |
| Community weakness | | .11** |
| | | .11 (.03) |
| Overall Family Problems × Community Weakness | | .06* |
| | | .06 (.03) |
| $R^2$ | .164 | .171 |

Note: For each variable, the standardized effect is shown in the top row, with the unstandardized effect and the standard error (in parentheses) shown below.
$*p \leq .05; **p \leq .01$ (two-tailed).

Overall, these results suggest that family effects are most clearly amplified by community disadvantage when the family environment is considered as a whole rather than in terms of its individual dimensions. In short, the analysis with the individual measures suggests only weak support for the amplification thesis, whereas the analysis with the composite measure of overall family problems offers fairly clear support.

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

**Table 4**
**The Interaction between Family Problems and Community**
**Disadvantage for the Disaggregated Family Measures**

| Variable | Main Effect | Interaction | |
|---|---|---|---|
| | $B$ | $B$ | $t$ |
| Community poverty | | | |
| Weak attachment | .25** | .03 | 1.02 |
| Weak supervision | .10** | −.05 | −1.83 |
| Weak reinforcement | .08** | .03 | 1.25 |
| Physical punishment | .09** | .07** | 2.61 |
| Coercive discipline | .13** | .02 | .95 |
| Perceived community weakness | | | |
| Weak attachment | .23** | .04 | 1.64 |
| Weak supervision | .10** | −.02 | −.82 |
| Weak reinforcement | .09** | .03 | 1.03 |
| Physical punishment | .08** | .05* | 2.09 |
| Coercive discipline | .12** | .04 | 1.45 |

Note: Each equation includes main effects for the family and community variables in question, an interaction term that is the product of the two, and controls for age, sex, race or ethnicity, parental education and income, mother's marital status, and child's wave 1 problem behavior. *$p \leq .05$; **$p \leq .01$ (two-tailed).

## Discussion and Conclusion

Families do not operate in a social vacuum; rather, they are part of a more elaborate social context. Criminological research on the family rarely has reflected this reality. Most studies have examined the family with little regard for how its effects may vary according to features of the social context. Drawing from several lines of criminological theory, our analysis sought to correct this by testing the hypothesis that family effects on crime would be significantly amplified by community disadvantage.

For the measure of overall family problems, the analysis supported this hypothesis. As community disadvantage increased, the effects on crime of family problems became stronger. This pattern was evident for both measures of community disadvantage that were considered: the objective level of community poverty (as indicated by U.S. census data) and the perceived inadequacy of the community as a place to raise children (as rated by a parent). Moreover, the interactions that were observed were substantively

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

important to the family-crime relationship. An increase of one standard deviation in community poverty, for example, increased the effect of overall family problems on crime by nearly 40 percent.

When using the individual family measures rather than the composite measure, the results were only suggestive of an amplifying effect of community disadvantage. Eight of 10 interaction coefficients had positive signs, but only 2 were statistically significant. Both significant interactions were for physical punishment, which was amplified by both measures of community disadvantage.

The results offering support for the amplification thesis are consistent with some of the analyses reported in several prior studies (Brody et al. 2003; Lindstrom 1996; Plybon and Kliewer 2001; Rankin and Quane 2002) but clearly inconsistent with two other studies (Gorman-Smith et al. 2000; Simons et al. 2002). This raises the question of how our study helps resolve the dilemma of these contradictory results. In several respects, our analysis offers the most comprehensive test of the amplification thesis. The NSC data used for this study were drawn from a national sample of U.S. families that came from a wide diversity of communities. Prior studies, on the other hand, have largely used homogeneous sampling groups for which there likely is restricted variation in key aspects of community context. Also in contrast to other studies, the NSC sample had significant diversity with respect to such things as race and family structure. Last, our study used a broad array of family measures meant to fully capture the overall quality of the family environment. Prior studies, on the other hand, have tended to focus on one or a small set of family variables, with little attention to the overall quality of the family environment. This issue may be of particular importance given the conclusion that family effects were most clearly amplified when the family environment was considered as a whole rather than in terms of its individual dimensions.

In considering the support that this study found for the amplification thesis, three main issues are important: How does it affect our interpretation of prior research? What future work does it suggest should be done? And what implications does it have for criminological theory?

Regarding the interpretation of prior research, a key consideration is whether these findings undermine its value, given that most studies have assumed that family effects are uniform across different communities. Our findings suggest limitations in those studies but do not render them without merit. The analysis revealed that community disadvantage affected the magnitude of family effects, not whether they were present to begin with. The

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

effect of overall family problems on overall crime is a good example. This standardized effect was strong ($B = .22$) even in a typical community (where community poverty is at its mean). It becomes greater (moving to .30) as community poverty increases to one standard deviation above its mean, but still is .14 in an advantaged community in which community poverty is one standard deviation below its mean. Thus, failing to consider community disadvantage as a moderator does nothing to undermine the conclusion that important family effects exist. It does, however, point to a missed opportunity to specify contextual factors that moderate those effects.

The findings presented here also have implications for future work. Most notably, the replication of these findings with other data is needed because so few studies have examined this issue. Future research also can go beyond our study in important ways. First, future research on this issue should try when possible to use data that allow for a temporal lag between the parenting and crime measures. The present study had to rely on measures of family problems and crime that came from the same wave of data, thereby introducing concerns about causal order. This problem was addressed in part by examining the family-crime relationship with equations that included a control for a child's prior problem behavior. The use of temporal lags in future research could further assuage concerns about causal order. A second way in which studies can go beyond this one is by considering the issue of intervening variables: Future work should consider how community disadvantage moderates effects of the family not just on juvenile involvement in crime but also on the intervening variables that may link the family to crime. Theories of crime suggest many such variables, including juveniles' levels of self-control (Gottfredson and Hirschi 1990), anger and frustration (Agnew 1992), and association with criminal peers (Akers 1998). Last, future research should consider whether the duration of a family's residence in a disadvantaged community influences the extent to which family effects are amplified by community disadvantage.

Regarding the implications these findings have for criminological theory, it was earlier noted that although many theories consider family effects, they devote less attention to whether they are moderated by such things as community disadvantage. Agnew's (1992) general-strain theory and Hirschi's (1969) social-control theory are exceptions, however, with both containing arguments consistent with the amplification thesis. The support found for the amplification thesis therefore provides support for these theories as well, indicating that they are useful not just for identifying family-related causes of crime but also for revealing how community context might make family variables even more consequential for crime.

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

The findings of this study also bolster the emerging theoretical principal that various causes of crime have interactive effects (Agnew 2005; Moffitt 1993; Wright et al. 2001). Specifically, a given cause may be more likely to increase crime when it occurs in the presence of other causes. This most often has been considered with respect to the interaction between individual traits and characteristics of the social environment (Grasmick et al. 1993; Lynam et al. 2000; Moffitt 1993; Wright et al. 2001): Low self-control, for example, may be most consequential for crime when combined with a criminogenic social environment. Agnew (2005) recently emphasized, however, that such interactions may be occurring between numerous different domains of life, including the family, the school, the peer group, and the labor force. In Agnew's words, "the effect of each life domain on crime is influenced . . . by the individual's standing on other life domains" (p. 110).

Moderated effects of this kind often are seen as neglected in criminological theory (see Tittle 1995). We see many exceptions to this, however, and therefore many avenues for theoretically driven research. Moderated effects are explicitly incorporated into many recent theories, including self-control theory (Gottfredson and Hirschi 1990), control-balance theory (Tittle 1995), reintegrative-shaming theory (Braithwaite 1989), and certain-life course theories (Moffitt 1993). The point to emphasize, therefore, is that if criminologists take seriously the notion of moderated effects, many theories can be brought to bear on this issue.

We hope that the findings presented here inspire such work. At a minimum, however, the conclusions from this study suggest that for family effects in particular, the failure to consider the community in which a family resides has been a limitation of prior research. Correcting this limitation should yield a more complete understanding of the effects of the family environment on crime and therefore contribute knowledge on the overall process by which crime is produced.

## Notes

1. Two other theories used to study the family provide no strong arguments on this topic. Self-control theory's (Gottfredson and Hirschi 1990) arguments are consistent with the amplification thesis, but only in an indirect way. It predicts that low self-control most increases crime when criminal opportunities are abundant (see Grasmick et al. 1993). Community disadvantage likely increases criminal opportunity, given its strong relationship with community-level crime rates (Bursik and Grasmick 1993; Sampson and Groves 1989). Thus, the effects of low self-control should be amplified by community disadvantage. Linking this hypothesis to

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

## Appendix A
### Means, Standard Deviations, and Correlations
### with Overall Crime for all Variables

| Variable | M | SD | Correlation with Overall Crime |
|---|---|---|---|
| Age | 13.97 | 1.58 | .18 |
| Sex | .50 | .50 | .17 |
| Non-White | .27 | .45 | −.01 |
| Parental education | 11.95 | 2.82 | −.03 |
| Parental income | 4.28 | 1.99 | −.03 |
| Unmarried mother | .28 | .45 | .07 |
| Wave 1 problem behavior | .00 | .62 | .20 |
| Weak attachment | .00 | 1.00 | .28 |
| Weak supervision | .00 | 1.00 | .11 |
| Weak reinforcement | .00 | 1.00 | .12 |
| Physical punishment | .00 | 1.00 | .06 |
| Coercive discipline | .00 | 1.00 | .15 |
| Overall family problems | .00 | 1.00 | .26 |
| Community poverty | .00 | 1.00 | .04 |
| Perceived inadequacy of community | .00 | 1.00 | .13 |
| Person/property crimes | .00 | 1.00 | .75 |
| Drug use | .00 | 1.00 | .64 |
| Police contacts | .00 | 1.00 | .72 |
| Overall crime | .00 | 1.00 | — |

## Appendix B
### Family Variables and Items

| Variable/Item | Response Categories | α |
|---|---|---|
| Weak attachment | | .76 |
| How close do you feel to your mother? | *Extremely close, quite close, fairly close, not close at all* | |
| Want to be the kind of person your mother is? | *A lot, quite a bit, just a little, not at all* | |
| Do you argue with your mother? | *Hardly ever, sometimes, often* | |
| Mother loves you and is interested in you? | *Very much, somewhat, not at all* | |
| How close do you feel to your father | *Extremely close, quite close, fairly close, not close at all* | |

*(continued)*

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

## Appendix B (continued)

| Variable/Item | Response Categories | α |
|---|---|---|
| Want to be the kind of person your father is? | *A lot, quite a bit, just a little, not at all* | |
| Do you argue with your father? | *Hardly ever, sometimes, often* | |
| Father loves you and is interested in you? | *Very much, somewhat, not at all* | |
| Is your relationship with child . . .?[a] | *Extremely close, quite close, fairly close, not close at all* | |
| Is your partner's relationship with child . . .?[a] | *Extremely close, quite close, fairly close, not close at all* | |
| Weak supervision | | .70 |
| Mother makes clear and consistent rules | *Very much, somewhat, not at all* | |
| Mother is firm with you | *Very much, somewhat, not at all* | |
| Mother wants to know where you are | *Very much, somewhat, not at all* | |
| Father makes clear and consistent rules | *Very much, somewhat, not at all* | |
| Father is firm with you | *Very much, somewhat, not at all* | |
| Father wants to know where you are | *Very much, somewhat, not at all* | |
| Parents have rules about where you are | Yes, no | |
| Parents have rules about doing homework | Yes, no | |
| Parents have rules about dating, parties | Yes, no | |
| Weak prosocial reinforcement | | .79 |
| When good, mother tells you she's pleased | *Often, sometimes, never* | |
| When good, mother kisses or hugs | *Often, sometimes, never* | |
| When good, mother takes you out somewhere | *Often, sometimes, never* | |
| When good, mother buys you something | *Often, sometimes, never* | |
| When good, father tells you she's pleased | *Often, sometimes, never* | |
| When good, father kisses or hugs | *Often, sometimes, never* | |

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized
distribution.

| | | |
|---|---|---|
| When good, father takes you out somewhere | *Often, sometimes, never* | |
| When good, father buys you something | *Often, sometimes, never* | |
| Physical punishment | | .88 |
| When bad, mother threatens to spank/slap | *Never, sometimes, often* | |
| When bad, mother actually spanks/slaps | *Never, sometimes, often* | |
| Has mother ever badly bruised or cut you? | No, yes | |
| When bad, father threatens to spank/slap | *Never, sometimes, often* | |
| When bad, father actually spanks/slaps | *Never, sometimes, often* | |
| Has father ever badly bruised or cut you? | No, yes | |
| Coercive discipline | | .61 |
| When bad, mother makes fun of you | *Never, sometimes, often* | |
| When bad, mother yells at you | *Never, sometimes, often* | |
| When bad, mother acts as if doesn't love you | *Never, sometimes, often* | |
| When bad, father makes fun of you | *Never, sometimes, often* | |
| When bad, father yells at you | *Never, sometimes, often* | |
| When bad, father acts as if doesn't love you | *Never, sometimes, often* | |

a. The item was answered by the parent rather than the child.

the family requires moving one step back in the theory's causal diagram. Family variables such as supervision and discipline are seen as key causes of a child's self-control. Thus, the prediction that community disadvantage amplifies the effects of self-control implies that it also amplifies the effects of the variables that are the causes of low self-control. Social-learning theory, on the other hand, generally excludes moderated relationships of any kind (Akers 1998:361-62; Krohn, Lanza-Kaduce, and Akers 1984).

2. The family variables were created by standardizing the constituent items and computing the average, with final scales standardized as well. Missing data were rare, with the one exception involving children from nonintact households. For children raised by both parents, scores were the averages of items for both parents, whereas for those raised by one parent, scores were the averages of items pertaining only to that parent.

3. Two other key predictors of crime, low self-control and association with delinquent peers, are potentially measurable with wave 2 (but not wave 1) NSC data. These were not used as controls, however, because each likely mediates family-crime relationships. Thus, includ-

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

ing these variables in the equations likely would have decreased or eliminated the family effects, but not because of spuriousness. It should be emphasized that given the stability of antisocial behavior (Nagin and Farrington 1992), the measure of wave 1 problem behavior provides the strongest control variable for protecting against spuriousness.

4. Both the main and interactive effects of the family variables were examined with equations that assessed the different variables separately. Preliminary analyses indicated that equations containing all variables together produced strong effects of attachment at the expense of the other family variables. Although this could indicate that attachment is the only family variable truly consequential for crime, a more likely explanation is that it is more proximate to crime than the other variables and likely mediates their effects. Prior research offers no firm conclusions on this issue, however, and it certainly does not suggest that attachment is the only important family variable. The most informative analysis, therefore, is to test the amplification thesis with separate equations for each of these family variables.

5. OLS regression was appropriate because, like most national data sets, the NSC's respondents were not sufficiently clustered to perform a multilevel analysis. In the NSC, more than 90 percent of ZIP codes represented in the sample contained a single respondent.

6. In analyses that test multiple variations of the same general hypothesis, it sometimes is useful to use a Bonferroni correction to account for the inflated type I error that exists for the set of equations as a whole (see Tabachnick and Fidell 2001). Doing this did little to alter the substantive pattern of results. When the critical value for each individual equation was adjusted downward to .01 (producing an overall critical value of .094 across the 10 equations), 1 of 10 (rather than 2 of 10) interactions was significant and positive.

# References

Adams, Terry K. 1991. *Documentation for 1970 and 1980 Census Extract Datasets*. Ann Arbor: University of Michigan, Institute for Social Research.

Agnew, Robert. 1985. "A Revised Strain Theory of Delinquency." *Social Forces* 64:151-67.

———. 1991. "Longitudinal Test of Social Control Theory and Delinquency." *Journal of Research in Crime and Delinquency* 28:126-56.

———. 1992. "Foundation for a General Strain Theory of Crime and Delinquency." *Criminology* 30:47-88.

———. 1993. "Why Do They Do It? An Examination of the Intervening Mechanisms between 'Social Control' Variables and Delinquency." *Journal of Research in Crime and Delinquency* 30:245-66.

———. 2005. *Why Do Criminals Offend? A General Theory of Crime and Delinquency*. Los Angeles: Roxbury.

Agnew, Robert, Timothy Brezina, John Paul Wright, and Francis T. Cullen. 2002. "Strain, Personality Traits, and Delinquency: Extending General Strain Theory." *Criminology* 40:43-71.

Aiken, Leona S. and Stephen G. West. 1991. *Multiple Regression: Testing and Interpreting Interactions*. Newbury Park, CA: Sage.

Akers, Ronald L. 1998. *Social Learning and Social Structure: A General Theory of Crime and Deviance*. Boston: Northeastern University Press.

Baron, Stephen W. 2004. "General Strain, Street Youth, and Crime: A Test of Agnew's Revised Theory." *Criminology* 42:457-83.

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

Baumer, Eric P. and Scott J. South. 2001. "Community Effects on Youth Sexual Activity." *Journal of Marriage and the Family* 63:540-54.

Braithwaite, John. 1989. *Crime, Shame and Reintegration.* New York: Cambridge University Press.

Brezina, Timothy J. 1998. "Adolescent Maltreatment and Delinquency: The Question of Intervening Processes." *Journal of Research in Crime and Delinquency* 35:71-99.

Brody, Gene H., Xiaojia Ge, Su Yeong Kim, Velma McBride Murry, Ronald L. Simons, Frederick X. Gibbons, Meg Gerrard, and Rand D. Conger. 2003. "Neighborhood Disadvantage Moderates Associations of Parenting and Older Sibling Problem Attitudes and Behavior with Conduct Disorders in African American Children." *Journal of Consulting and Clinical Psychology* 71:211-22.

Brooks-Gunn, Jeanne, Greg J. Duncan, Pamela Kato Klebanov, and Naomi Sealand. 1993. "Do Neighborhoods Influence Child and Adolescent Development?" *American Journal of Sociology* 99:353-95.

Bursik, Robert J., Jr. and Harold G. Grasmick. 1993. *Neighborhoods and Crime: The Dimensions of Effective Community Control.* New York: Lexington.

Burton, Linda M. and Robin L. Jarrett. 2000. "In the Mix, on the Margins: The Place of Families in Urban Neighborhood and Child Development Research." *Journal of Marriage and the Family* 62:1114-35.

Catalano, Richard and J. David Hawkins. 1996. "The Social Development Model: A Theory of Anti-Social Behavior." Pp. 149-97 in *Delinquency and Crime: Current Theories*, edited by J. David Hawkins. New York: Cambridge University Press.

Cernkovich, Stephen A. and Peggy C. Giordano. 1987. "Family Relationships and Delinquency." *Criminology* 25:295-319.

Dugdale, Richard G. 1877. *The Jukes: A Study in Crime, Pauperism, Disease and Heredity.* New York: Putnam.

Dunford, Franklyn W. and Delbert S. Elliott. 1984. "Identifying Career Offenders Using Self-Reported Data." *Journal of Research in Crime and Delinquency* 21:57-86.

Farrington, David, Robert J. Sampson, and Per-Olof Wikström, eds. 1993. *Integrating Individual and Ecological Aspects on Crime.* Stockholm, Sweden: National Council for Crime Prevention.

Glueck, Sheldon and Eleanor Glueck. 1950. *Unraveling Juvenile Delinquency.* Cambridge, MA: Harvard University Press.

Gorman-Smith, Deborah, Patrick H. Tolan, and David B. Henry. "A Developmental-Ecological Model of the Relation of Family Functioning to Patterns of Delinquency." *Journal of Quantitative Criminology* 16:169-98.

Gottfredson, Michael and Travis Hirschi. 1990. *A General Theory of Crime.* Palo Alto, CA: Stanford University Press.

Grasmick, Harold, Charles Tittle, Robert J. Bursik, Jr., and Bruce J. Arneklev. 1993. "Testing the Core Empirical Implications of Gottfredson and Hirschi's General Theory of Crime." *Journal of Research in Crime and Delinquency* 30:5-29.

Harris, Judith R. 1998. *The Nurture Assumption: Why Children Turn Out the Way They Do: Parents Matter Less Than You Think.* New York: Free Press.

Hay, Carter. 2001. "Parenting, Self-Control, and Delinquency: A Test of Self-Control Theory." *Criminology* 39:707-36.

———. 2003. "Family Strain, Gender, and Delinquency." *Sociological Perspectives* 46:107-35.

Healy, William. 1915. *Honesty.* Indianapolis, IN: Bobbs-Merrill.

Hirschi, Travis. 1969. *Causes of Delinquency.* Berkeley: University of California Press.

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

354    Journal of Research in Crime and Delinquency

Huang, Bu, Rick Kosterman, Richard F. Catalano, J. David Hawkins, and Robert D. Abbott. 2001. "Modeling Mediation in the Etiology of Violent Behavior in Adolescence: A Test of the Social Development Model." *Criminology* 39:75-108.

Jaccard, James, Robert Turrisi, and Choi K. Wan. 1990. *Interaction Effects in Multiple Regression.* Newbury Park, CA: Sage.

Jang, Sung Joon. 1999. "Age-Varying Effects of Family, School, and Peers on Delinquency: A Multilevel Modeling Test of Interactional Theory." *Criminology* 37:643-85.

Kandel, Denise and Ping Wu. 1995. "Disentangling Mother-Child Effects." Pp. 106-23 in *Coercion and Punishment in Long-Term Perspectives*, edited by J. McCord. New York: Cambridge University Press.

Krohn, Marvin D., Lonn Lanza-Kaduce, and Ronald L. Akers. 1984. "Community Context and Theories of Deviant Behavior: An Examination of Social Learning and Social Bonding Theories." *Sociological Quarterly* 25:353-71.

Laub, John H. and Robert J. Sampson. 1988. "Unraveling Families and Delinquency: A Reanalysis of the Gluecks' Data." *Criminology* 26:355-79.

Larzelere, Robert E. and Gerald R. Patterson. 1990. "Parental Management: Mediator of the Effect of Socio-Economic Status on Early Delinquency." *Criminology* 28:301-23.

Lindstrom, Peter. 1996. "Family Interaction, Neighborhood Context and Deviant Behavior: A Research Note." *Studies on Crime and Crime Prevention* 5:113-19.

Loeber, Rolf and Magda Stouthamer-Loeber. 1986. "Family Factors as Correlates and Predictors of Juvenile Conduct Problems and Delinquency." Pp. 29-149 in *Crime and Justice, Vol. 7*, edited by M. Tonry and N. Morris. Chicago: University of Chicago Press.

Lynam, Donald R., Avshalom Caspi, Terrie E. Moffitt, Per-Olof Wikstrom, Rolf Loeber, and Scott P. Novak. 2000. "The Interaction between Impulsivity and Neighborhood Context on Offending: The Effects of Impulsivity are Stronger in Poorer Neighborhoods." *Journal of Abnormal Psychology* 109:563-74.

Mazerolle, Paul and Jeff Maahs. 2000. "General Strain and Delinquency: An Alternative Examination of Conditioning Influences." *Justice Quarterly* 17:753-78.

McClelland, Gary H. and Charles M. Judd. 1993. "Statistical Difficulties of Detecting Interactions and Moderator Effects." *Psychological Bulletin* 114:376-90.

Moffitt, Terrie E. 1993. "Adolescence-Limited and Life-Course-Persistent Antisocial Behavior: A Developmental Taxonomy." *Psychological Review* 100:674-701.

Nagin, Daniel S. and David P. Farrington. 1992. "The Stability of Criminal Potential from Childhood to Adulthood." *Criminology* 30:235-60.

Nye, F. Ivan. 1958. *Family Relationships and Delinquent Behavior.* New York: John Wiley.

Osgood, D. Wayne, Laura L. Finken, and Barbara J. McMorris. 2002. "Analyzing Multiple-Item Measures of Crime and Deviance II: Tobit Regression Analysis of Transformed Scores." *Journal of Quantitative Criminology* 18:319-47.

Patterson, Gerald R. 1982. *Coercive Family Process.* Eugene, OR: Castalia.

Patterson, Gerald and Thomas Dishion. 1985. "Contributions of Families and Peers to Delinquency." *Criminology* 23:63-79.

Plybon, Laura E. and Wendy Kliewer. 2002. "Neighborhood Types and Externalizing Behavior in Urban School-Age Children: Tests of Direct, Mediated, and Moderated Effects." *Journal of Child and Family Studies* 10:419-37.

Rankin, Bruce H. and James M. Quane. 2002. "Social Contexts and Urban Adolescent Outcomes: The Interrelated Effects of Neighborhoods, Families, and Peers on African-American Youth." *Social Problems* 49:79-100.

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

Rankin, Joseph H. and L. Edward Wells. 1990. "The Effect of Parental Attachments and Direct Controls on Delinquency." *Journal of Research in Crime and Delinquency* 27:140-65.

Sampson, Robert J. and W. Byron Groves. 1989. "Community Structure and Crime: Testing Social Disorganization Theory." *American Journal of Sociology* 94:774-802.

Sampson, Robert J. and John Laub. 1993. *Crime in the Making: Pathways and Turning Points through Life*. Cambridge, MA: Harvard University Press.

Sampson, Robert J., Stephen Raudenbush, and Felton Earls. 1997. "Neighborhoods and Violent Crime: A Multilevel Study of Collective Efficacy." *Science* 277:918-24.

Simons, Ronald L., Christine Johnson, Rand D. Conger, and Glen Elder, Jr. 1998. "A Test of Latent-Trait versus Life-Course Perspectives on the Stability of Antisocial Behavior." *Criminology* 36:217-43.

Simons, Ronald L., Kuei-Hsiu Lin, Leslie C. Gordon, Gene H. Brody, Velma Murry, and Rand D. Conger. 2002. "Community Differences in the Association between Parenting Practices and Child Conduct Problems." *Journal of Marriage and Family* 64:331-45.

Simons, Ronald L., Leslie Gordon Simons, and Lora Ebert Wallace. 2004. *Families, Delinquency, and Crime: Linking Society's Most Basic Social Institution to Antisocial Behavior*. Los Angeles: Roxbury.

South, Scott J. and Eric P. Baumer. 2000. "Deciphering Community and Race Effects on Adolescent Premarital Childbearing." *Social Forces* 78:1379-1408.

Tabachnick, Barbara G. and Linda S. Fidell. 2001. *Using Multivariate Statistics*. Needham Heights, MA: Allyn & Bacon.

Thornberry, Terence P. 1987. "Towards an Interactional Theory of Delinquency." *Criminology* 25:863-92.

Tibbetts, Stephen G. and Alex R. Piquero. 1999. "The Influence of Gender, Low Birth Weight, and Disadvantaged Environment in Predicting Early Onset of Offending: A Test of Moffitt's Interactional Hypothesis." *Criminology* 37:843-77.

Tittle, Charles. 1995. *Control Balance: Toward a General Theory of Deviance*. Boulder, CO: Westview.

Tittle, Charles and Ekaterina Botchkovar. 2005. "Self-Control, Criminal Motivation, and Deterrence: An Investigation Using Russian Respondents." *Criminology* 43:307-54.

Van Voorhis, Patricia, Francis T. Cullen, Richard A. Mathers, and Connie Chenoweth Garner. 1988. "The Impact of Family Structure and Quality on Delinquency: A Comparative Assessment of Structural and Functional Factors." *Criminology* 26:235-61.

Warr, Mark. 1993. "Parents, Peers, and Delinquency." *Social Forces* 72:247-64.

Wells, L. Edward and Joseph H. Rankin. 1988. "Direct Parental Controls and Delinquency." *Criminology* 26:263-85.

Wikstrom, Per-Olof H. and Rolf Loeber. 2000. "Do Disadvantaged Neighborhoods Cause Well-Adjusted Children to Become Adolescent Delinquents? A Study of Male Juvenile Serious Offending, Individual Risk and Protective Factors, and Neighborhood Context." *Criminology* 38:1109-42.

Williams, Jay R. and Martin Gold. 1972. "From Delinquent Behavior to Official Delinquency." *Social Problems* 20:209-29.

Wright, Bradley, Avshalom Caspi, Terrie E. Moffitt, and Ray Paternoster. 2004. "Does the Perceived Risk of Punishment Deter Criminally Prone Individuals? Rational Choice, Self-Control, and Crime." *Journal of Research in Crime and Delinquency* 41:180-214.

Wright, Bradley R. Entner, Avshalom Caspi, Terrie E. Moffitt, and Phil A. Silva. 2001. "The Effects of Social Ties on Crime Vary by Criminal Propensity: A Life-Course Model of Interdependence." *Criminology* 39:321-52.

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized distribution.

356    Journal of Research in Crime and Delinquency

Wright, John Paul and Francis T. Cullen. 2001. "Parental Efficacy and Delinquent Behavior:
Do Control and Support Matter?" *Criminology* 39:677-705.
Zill, Nicholas, Frank Furstenburg, Jr., James Peterson, and Kristin Moore. 1990. *National
Survey of Children: Wave I, 1976, Wave II, 1981, and Wave III, 1987* (ICPSR 8670). Ann
Arbor, MI: Inter-University Consortium for Political and Social Research.

**Carter Hay** is an assistant professor in the College of Criminology and Criminal Justice at
Florida State University in Tallahassee. His research examines the causes of individual
involvement in crime and delinquency, particularly those causes related to the family environ-
ment. His prior publications have appeared in such journals as *Criminology*, the *Journal of
Research in Crime and Delinquency*, *Sociological Perspectives*, and *Theoretical Criminology*.

**Edward N. Fortson** is a PhD student at Washington State University in the Department of
Sociology. His areas of specialization are criminology and social psychology. His current
research interests include examining how structural features of communities influence indi-
vidual levels of self-control, as well as investigating the social-psychological processes that
affect perceptions of equity and subsequent emotional reactions.

**Dusten R. Hollist** is an assistant professor of sociology at the University of Montana in
Missoula. His current research deals with the connection between family-based sources of
strain and juvenile delinquency and the roles and identities that adolescents use within delin-
quent peer networks.

**Irshad Altheimer** is an assistant professor of criminal justice at Wayne State University. He
received his PhD in sociology from Washington State University in 2005. His current research
explores the factors that influence cross-national variation in crime and incarceration.

**Lonnie M. Schaible** is an assistant professor in the Department of Sociology and Criminal
Justice at Eastern Washington University. His current research is focusing on the interaction
between emotional labor, professional identity, and value dissonance on the levels of burnout
and cynicism among police officers.

Downloaded from http://jrc.sagepub.com by on May 30, 2008
© 2006 SAGE Publications. All rights reserved. Not for commercial use or unauthorized
distribution.